IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| INTERLEASE AVIATION INVESTORS II (ALOHA) L.L.C., an Illinois limited liability company; INTERLEASE AVIATION INVESTORS III (TACA) L.L.C., an Iowa limited liability company; and MIMI LEASING CORP., an Iowa corporation, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) No. 02 C 4801 |
| v. | ) |
| | ) Amy J. St. Eve, Presiding Judge |
| VANGUARD AIRLINES, INC., a Delaware corporation; PEGASUS AVIATION, Inc., a foreign corporation; VANGUARD ACQUISITION COMPANY, AIRLINE INVESTMENTS INC.; SEABURY GROUP, LLC,   a New York limited liability company; and RICHARD S. WILEY | ) Edward A. Bobrick, Magistrate ) ) ) ) ) ) ) ) |
| Defendants | ) ) |
| PEGASUS AVIATION, Inc. and VANGUARD ACQUISITION COMPANY | ) ) ) ) |
| Counterplaintiffs | ) ) |
| INTERLEASE AVIATION INVESTORS II (ALOHA) L.L.C.; INTERLEASE AVIATION INVESTORS III (TACA) L.L.C.; MIMI LEASING CORP.; PHILLIP COLEMAN; and DOES 1 through 5, inclusive, | ) ) ) ) ) ) ) |
| Counterdefendants | ) ) |

**COUNTERDEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Counterdefendants, INTERLEASE AVIATION INVESTORS II (ALOHA) L.L.C.

("Interlease II"), INTERLEASE AVIATION INVESTORS III (TACA) L.L.C. ("Interlease III") and

MIMI LEASING CORP.("Mimi"), by their attorneys, Eric S. Palles and Gary Ravitz, and RAVITZ

& PALLES, P.C., in support of their motion for summary judgment with respect to Counts I, II and IV of the Counterclaims, state as follows:

<u>THE COUNTERCLAIM</u>

Counterplaintiffs have filed four-count counterclaims[1], each containing three virtually indistinguishable fraud claims. The claims are both unnecessarily prolix and, yet, devoid of content. The counterclaims allege that counterdefendants, through Philip Coleman, induced counterplaintiff Pegasus Aviation, Inc.("Pegasus") to enter into an arrangement to lease planes ("the Lease Transaction") to Vanguard Airlines, Inc. ("Vanguard"), Pegasus Corrected Counterclaim (Dkt. 71) at ¶¶21-22, and, through counterplaintiff Vanguard Acquisition Company ("VAC"), to invest approximately $3.25 million in the purchase of Vanguard stock ("the Capital Transaction"). VAC Counterclaim (Dkt. 68) at ¶21. The fraud allegations are opaque and the Fed. R. Civ. P. 9(b) requirement that a claimant plead with specificity the "who, what, when, where, and how" of the fraud has been ignored. <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990). It appears, however, that the fraud took the form of "statements and conduct" that included the following:

a.    Coleman's "representation" that he believed that the consummation of the Capital Transaction and Lease Transaction would make Vanguard's business plan feasible, together with the correlative "omission" that he knew that the plan could not be effectuated (Count I); and

b.    Coleman's "representation" that Vanguard and the counterdefendants had entered into binding and enforceable agreements to amend Vanguard's existing leases with counterdefendants and to defer a portion of Vanguard's obligations to counterdefendants to pay rents on its current fleet

---

[1] On July 10, 2003, Judge Alesia granted plaintiffs' motion to realign intervening plaintiff Vanguard Acquisition Company as a defendant/counter-plaintiff. Dkt. 75.

of aircraft, together with the correlative "omission" that they had actually signed agreements in principle (id.).

Count II reiterates that Coleman represented that Vanguard and the counterdefendants had entered into binding and enforceable agreements to amend Vanguard's existing leases when, in fact, he never intended to negotiate in good faith for or to enter into any lease deferrals.[2] Count IV recasts the entire body of the counterclaim as a fraudulent scheme. The misrepresentations were allegedly communicated orally by Coleman to Richard Wiley, CEO of Pegasus and VAC, Dkt. 71 at ¶25; Dkt. 68 at ¶24; Dep. Ex. 2 at Response Nos. 14, 15, and, with respect to the Vanguard agreements, in unspecified writings. Dkt. 71 at ¶42; Dkt. 68 at ¶41.

THE FACTS

Between 1995 and 1997, counterdefendants entered into four separate leases of Boeing 737 aircraft to Vanguard. Counterdefendants' Statement of Material Facts (56.1 Statement) at ¶10. In 2000, Vanguard engaged Seabury Group LLC ("Seabury"), an investment banking and advisory firm, to recruit a CEO, develop a business plan, and attract a new aircraft provider who, ideally, would provide capital and financing. 56.1 Statement at ¶11. The aircraft provider turned out to be Pegasus. Dkt. 71 at ¶ 20. Seabury, through Thomas Mahr, approached Wiley around September 2000 to discuss Pegasus's involvement with Vanguard. 56.1 Statement at ¶ 13. By December 2000, Pegasus had agreed to lease six to eight MD 80 aircraft (the "Lease Transaction") and to purchase

---

[2]The allegation concerning Coleman's intent is based on Counterplaintiffs' unspecified "information and belief," ( Dkt. 71 at ¶24; Dkt. 68 at ¶23) "Allegations made upon information and belief are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir., 1992). Hence, this is not a "well-pleaded"fact that must be accepted as true under a summary judgment analysis.

$3 million of Vanguard preferred stock (the "Capital Transaction"). Separately, International Aero Components, Inc. ("IAC"), a Pegasus affiliate, loaned Vanguard $3 million, secured by airline parts, by the end of the year 2000. 56.1 Statement, at ¶18, 20.

Vanguard, at Seabury's recommendation, then turned to its existing lessors, including counterdefendants, to obtain a "loan" in the form of deferred rent payments. Dep. Ex. 97 at SEA 01598. In a meeting in Chicago on January 25, 2001, Seabury represented to the counterdefendants that Pegasus had entered into a strategic partnership to lease aircraft and to invest in Vanguard. Dep. Ex. 99 at 23; Carroll Dep. at 112, 150. Coleman and Wiley spoke by phone on or about February 14, 2001. While versions of that conversation may differ, compare Wiley (Jan.)Dep. at 54-55 with Wiley (Oct.) Dep. at 44-48, see also Dep. Ex. 112, it may be conceded for purposes of this motion, that Coleman expressed his belief that Vanguard had a viable business plan. 56.1 Statement at ¶45.

With the departure of Vanguard's general counsel and chief financial officer by February 2001, Seabury separately concluded the four agreements in principle with counterdefendants on March 8, 2001 and the Capital Transaction with VAC on March 9, 2001. Palles Aff. Ex.7; Dep. Ex. 196. When Vanguard subsequently defaulted on its obligations to counterdefendants in July 2001, Wiley conferred with Coleman and claims to have learned that Coleman "didn't believe in the plan." Wiley (Oct.) Dep. at 44.

ARGUMENT

1.    The Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, interrogatory answers, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P 56. The rule also mandates

4

the entry of summary judgment against a claimant "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Although in its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party, Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560 (7th Cir. 1996), the non-moving party cannot create an issue of fact through speculation or conjecture. Borcky v. Maytag, 248 F.3d 691, 695 (7th Cir. 2001).

2.      Choice of Law

This court's jurisdiction is based on diversity of citizenship. Consequently, the substantive rights of the parties are governed by state law. Help at Home, Inc. v. Medical Capital, LLC, 260 F.3d 748, 753 (7th Cir. 2004). Because the counterclaims allegedly arise out of counterdefendants' tortious conduct in the State of Illinois,(Dkt. 71 at ¶¶14-16; Dkt. 68 at ¶¶13-15), the governing law is the substantive law of Illinois.

The counterplaintiffs' claims of fraud and fraudulent scheme fail under Illinois law because they cannot make a showing (a) of false statements of material fact, or (b) that they relied on the statements. Additionally, the counterplaintiffs' claims of fraud by omission fail because they cannot show that the counterdefendants owed them a duty of disclosure. Finally, the claim of fraudulent scheme fails because the claim does not satisfy the exception to Illinois law barring promissory fraud actions.

3.      Counterdefendants are Entitled to Summary Judgment on the Claim of Intentional Fraud (Count I)

In Illinois, the elements of fraud are: "(1) a false statement of material fact; (2) the party

5

making the statement knew or believed it to be untrue; (3) the party to whom the statement was made

had a right to rely on the statement; (4) the party to whom the statement was made did rely on the

statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the

reliance by the person to whom the statement was made led to that person's injury." Siegel v. Levy

Organization Development Co., 153 Ill. 2d 534, 542-43, 607 N.E.2d 194 (1992). Counterdefendants

are entitled to judgment as a matter of law because, giving the counterplaintiffs every favorable

inference from their pleadings and from the evidence adduced during discovery, they cannot

establish the first and fourth elements of fraud: either that there was a false statement of material fact,

or that the counterplaintiffs relied upon any such statement in entering into the Lease Transaction

or the Capital Transaction.

      a.     There was no false statement of material fact

Coleman's "representation" that he believed that the consummation of the Capital

Transaction and Lease Transaction would make Vanguard's business plan feasible does not support

a claim of fraud. The alleged statement is not a statement of material fact; it is an expression of

opinion regarding future events. "To support an action for fraud, the alleged misrepresentation must

be one of fact and not an expression of opinion." People ex rel. Peters v. Murphy-Knight, 248 Ill.

App. 3d 382, 387, 618 N.E.2d 459, 463 (1st Dist. 1993), citing Duhl v. Nash Realty, Inc., 102 Ill.

App. 3d 483, 429 N.E.2d 1267(1st Dist. 1981); Equity Capital Corp. v. Kreider Transp. Serv., Inc.,

967 F.2d 249 (7th Cir. 1992). While it is true that a party who purports to base a prediction upon

expertise or special knowledge that, in fact, does not exist, may be liable for fraud, see Gottreich v.

San Francisco Inv. Corp., 552 F.2d 866, 867 (9th Cir. 1977), there is no evidence that Coleman

claimed any such expertise. Indeed, Wiley was influenced that Seabury, "a sophisticated financial

advisory firm," endorsed the Vanguard business plan. Wiley (Oct.) Dep. at 39. By contrast, the counterdefendants were, like Pegasus, in the business of leasing aircraft, only to a significantly smaller degree.[3]

To the extent that Counterplaintiffs claim that Coleman's statement that he believed in the Vanguard plan falsely represented his then-existing state of mind, the evidence is notably lacking. Coleman has testified that he thought Vanguard's operational plan looked good, and observed that Vanguard's representatives seemed convinced it could succeed. Coleman Dep. at 150, 162. Counterdefendants' acquiescence in a deferral of Vanguard's lease obligations on March 8, 2001 only confirms this. Coleman Dep. at 159-61; Carroll Dep. at 128. Wiley's testimony that Coleman told him at the end of July 2001, after Vanguard had defaulted on every agreement in principle and promissory note, that he " really didn't believe in the business plan . . . .and . . .thought it would not work," Wiley (Oct.) Dep. at 48, is not probative of Coleman's state of mind in February, when he allegedly commented favorably.

Coleman's alleged statements "regarding the existence of actual agreements" are not actionable fraud because (1) there is no evidence that any statement was made; and (2) any statement, if made, would have been merely an opinion or legal conclusion. There is also absolutely no support in the record that the counterdefendants ever made a "statement" that they had entered into "actual" or "binding, enforceable agreements" rather than the agreements in principle. Wiley and Coleman never discussed the matter. Wiley Dep. (Oct.) at 48-50 Nor was there any written communication between the counterclaim parties until August 1, 2001, when Coleman and Wiley exchanged faxes. Dep. Ex.14. Pegasus had long since entered into the Vanguard transactions.

_____

[3] Pegasus is the largest privately-held aircraft leasing company in the world. Dkt. 97 at ¶8.

Rather, it was Seabury that, when the Capital Transaction closed on March 9, 2001, represented to Pegasus "that they had signed up satisfactory deferral programs with the various lessors that they were negotiating with at the time to make the business plan be acceptable to Pegasus." Wiley Dep (Oct.) at 43. Seabury also transmitted the signed agreements in principle to counterplaintiffs. Dep. Ex. 194; 56.1 Statement at 31. There is no evidence that Coleman directed Seabury to communicate with counterplaintiffs, or, for that matter, any claim that Seabury mislead Pegasus or Wiley. Nor was there any misapprehension that the agreements were agreements in principle which contemplated further documentation. Wiley's testimony on this point is unequivocal:

> Q.    Okay. Between the conversation that you recited earlier, the three-way conversation between you and Mr. Mahr and Mr. Coleman, and the closing on March 9[th] of 2001, did Mr. Coleman or anyone else on behalf of the plaintiffs make any representations to you which in light of future circumstances you found to be untrue?
> * * * * * *
> A.    I don't recall any other conversations other than a phone call from Seabury saying that the lessor deferrals had been agreed as promises, but I do not believe they were documented at the time.
> Q.    When you say "the lessor deferrals," are you referring specifically to the Coleman lessor deferrals or to others?
> A.    All of the deferrals. The restructurings were satisfactory to meet the acceptable business plan for Pegasus; that I believe they were closed as promises with documentation to follow.

Wiley (Oct.) Dep. at 54-55.

Were there any evidence that Coleman represented that there were "actual" or "enforceable" agreements rather than agreements in principle, the representation would not be actionable because the representations would be opinions and the falsity, if any, is in the legal characterization of the document. A legal conclusion cannot form the basis of a claim of misrepresentation. Hoseman v. Weinschneider, 277 B.R. 894, 2002 U.S. Dist. LEXIS 9126 (N.D. Ill. 2002) (Bucklo, J.), aff'd, 322

8

F.3d 468 (7th Cir. 2003), citing McComb v. Seestadt, 93 Ill. App. 3d 705, 417 N.E. 2d 705, 709 (1981). The reason for this rule is clear; statements of the law are, by their nature, opinion and are seldom clearly false. Indeed, as a purely legal proposition, the assertion that the agreements in principle were binding and enforceable is likely true. If the parties in the instant case intended that the agreements in principle be contractually binding, that intention would not be defeated by the mere recitation in the writing that a more formal agreement was yet to be drawn. Quake Construction, Inc. v. American Airlines, Inc., 141 Ill. 2d 281, 565 N.E.2d 990 (1990); Interway, Inc. v. Alagna, 85 Ill. App. 3d 1094, 1098 407 N.E.2d 615, 618(1980).

  b.  <u>There was no reliance in fact</u>

  There is not a scintilla of evidence that anything Philip Coleman said to Richard Wiley had any effect whatsoever upon the counterplaintiffs' decision to move forward with the Lease Transaction and with the Capital Transaction. First, the chronology is simply wrong. Seabury approached Pegasus in September 2000. 56.1 Statement at ¶¶14-15. The Vanguard deal was subsequently reviewed by the counterplaintiffs' analysts, marketers and lawyers. Wiley (Jan.) Dep. at 45-46. By December 2000, the essential terms of the deal with Vanguard were clearly defined and Wiley had caused IAC to fund Vanguard. Dep. Ex. 246, at 1-7; Della Dep at 27-31; Palles Aff., Exs. 1, 2. Vanguard and Seabury did not approach its Boeing 737 lessors, and particularly counterdefendants, to seek defer rent payments until late January 2001. Artist Dep. at 13-17; McKenzie Dep. at 18-21. By then, Seabury touted the Pegasus investment of $7 million in "capital" and its role as provider of the new MD-80 aircraft. Dep.Ex 99 at 23; Carroll Dep. at 112, 150. Wiley testified that he was unaware that Seabury and Vanguard met with Coleman in January 2001 to discuss lease deferrals. Wiley Dep (Jan) at 48-49. Nonetheless, on February 1, 2001, Pegasus

concluded its first lease for an MD-80 aircraft with Vanguard (Palles Aff. Ex. 3) and the aircraft was delivered to Vanguard on or about March 22, 2001. Id.; Dkt. 71 at ¶22; Dkt. 68 at ¶21.

On March 8, 2001, counterdefendants and Vanguard executed the four agreements in principle and VAC purchased its first round of Vanguard stock the next day. Rule 56.1 Statement at ¶¶29-30. Notwithstanding Seabury's representations to the contrary, however, (see, e.g., Palles Aff. Ex. 8) Wiley disavows Pegasus's reliance on the lease deferrals. As Wiley testified:

> Q:    In the first quarter of 2001, did you advise Vanguard that a precondition of the contribution of equity which later became the VAC transaction was conditioned upon the deferral by these Lessors of their rent – certain of their rent obligations?
>
> A:    Our investment wasn't conditional upon that. Our investment was a going-forward plan. Under the set of projections that they represented to us. They were restructuring previous leases. We frankly didn't – it didn't that much matter to us.
>
> Q:    So your testimony then is that the deferral of leases were not a precondition for any future investment by Pegasus?
>
> A:    The investment was based on the business plan, the going-forward plan which included many things that Vanguard was doing.

Wiley (Oct.) Dep. at 41-42.

The circumstances surrounding the Capital Transaction supports this testimony. The transaction closed notwithstanding the fact that Pegasus had not received the counterdefendants agreements with Vanguard, nor for that matter, agreements from any of the other B-737 lessors.[4] Wiley (Oct.) Dep. at 55. Had the lease deferrals truly been a condition for the Vanguard deal, the counterplaintiffs surely would have wanted to review those documents.

Subsequent events also confirm that the counterplaintiffs did not rely on the lease deferrals

---

[4] Significantly, the only other extant lessor deferral document is an "Agreement in Principle" with US Air, lessor of four planes to Vanguard, dated March 23, 2001. Palles Aff., Ex 9. Pegasus had, by this time, begun delivering MD-80 aircraft to Vanguard. Rule 56.1 Statement at ¶26.

10

from the counterdefendants in deciding to move forward with the Vanguard Deal.. After counterplaintiffs received the agreements in principle, they sent Vanguard a total of $3,550,000 in four installments between April 19th and May 30, 2001.Palles Aff., Exs.4-7. The bulk of these fund transfers occurred after a detailed financial analysis performed by Pegasus without any input from Coleman. Dep. Ex. 265; Wiley Dep. (Oct.) 84-87. The fact that the counterplaintiffs made these payments after they had actual copies of the agreements in principle is significant because "the Seventh Circuit has routinely held that 'a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehood.'" Niki Dev. Corp. v. Hob Hotel Chi. Partners, L.P., No. 00 C 2558, 2003 U.S. Dist. LEXIS 4949 at *31, (N.D. Ill , March 28, 2003), (Guzman, J.), citing Rissman v. Rissman, 213 F.3d 381, 384 (7th Cir., 2000).[5]

The counterplaintiffs cannot seriously argue they relied on any Coleman representation concerning the status of the Vanguard lease deferrals. See Fane v. Zimmer, Inc., 927 F.2d 124, 130 (2nd Cir. 1991)(where plaintiff medical patient was not aware of the alleged misrepresentation and the plaintiff's physician admitted that he did not rely on the alleged misrepresentations, then there is no reliance).

    c.    The alleged omissions are not actionable fraud

Counterplaintiffs also allege in Count I that they were defrauded by Coleman's "omissions." Dkt. at ¶¶36, 53; Dkt. 68 at ¶¶35, 52. In Illinois, failure to disclose material information may be considered a false statement of material fact, but only if the person failing to disclose the information

---

[5]Because it is clear that the Pegasus counterplaintiffs did not in fact rely on any representation concerning the enforceability of the agreements in principle, it is unnecessary to consider the further question whether any reliance was justified. In this regard, however, it is sufficient to note that Coleman does not have a law degree and the agreements were reviewed by Philip Jackmauh, Pegasus's deputy general counsel. Coleman Dep. at 9; 56.1 Statement at ¶31.

"owed a duty to disclose that information to the party across the bargaining table." Equity Capital Corp. v. Kreider Transp. Service, Inc., 967 F.2d 249, 253 (7th Cir. 1992). Generally, such a duty arises in two circumstances: 1) when there is a fiduciary relationship, or 2) when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension. Coca-Cola Co. Foods Div. v. Olmarc Packaging Co., 620 F. Supp. 966, 973 (N.D. Ill.1985); Lefebvre Intergraphics v. Sanden Machine, Inc., 946 F. Supp. 1358, 1366 (N.D. Ill, 1996)(Alesia, J.). Also, when a representation is made by professionals or those with greater access to information than the recipient,[6] there may be an obligation to disclose data indicating that the opinion or forecast may be doubtful. Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985), *cert. denied sub nom.* Wasserstrom v. Eisenberg, 474 U.S. 946, 106 S. Ct. 343, 88 L. Ed. 2d 290, 106 S. Ct. 342 (1985). A fiduciary relationship between Coleman and Wiley is, of course, lacking. They both represented certain of Vanguard's lessors and spoke once on the telephone during the relevant period. Nothing in the record suggests Wiley reposed any special trust or confidence in Coleman. Further, as previously noted, there is no basis on the record to infer that Wiley misapprehended any material fact. Wiley (Oct.) Dep. at 39, 54-55. Finally, there is an absence of any record evidence to suggest that, based upon their single phone call, Coleman knew of any such misapprehension and therefore *intentionally* failed to correct it.

Counterdefendants are entitled to summary judgment regarding Count I of the counterclaims.

4.    There is No Evidence of A Fraudulent Scheme

Count II of the counterclaim essentially alleges a fraudulent scheme, as that concept is

_____

[6]By way of concrete example, The Seabury Group.

understood in Illinois.[7] The operative claim is not only that Coleman did not enter into binding and enforceable agreements to amend Vanguard's existing leases, but that, in fact, he never intended to negotiate in good faith for or to enter into any lease deferrals.

As a general rule, promissory fraud is not actionable in Illinois. A limited exception exists when false promises are part of a "scheme to defraud." E.g. J.H. Desnick v. American Broadcasting Cos., 44 F.3d 1345, 1355 (7th Cir., 1995); HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 545 N.E.2d 672, 682 (Ill. 1989). To establish a claim of fraudulent scheme, however, the plaintiff must show a pattern of fraudulent acts. Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 866 (7th Cir., 1999) ("By requiring that the plaintiff show a pattern, by thus not letting him rest on proving a single promise, the law reduces the likelihood of a spurious suit; for a series of unfulfilled promises is better (though of course not conclusive) evidence of fraud than a single unfulfilled promise.")

Here, there is an absence of a single act, let alone a pattern of conduct, from which the fraudulent intent may be inferred. After counterdefendants signed the agreements in principle, David Rescino took the lead in consummating the documentation contemplated by the agreements in principle. Thomas Mahr Dep. at 46-47; David Rescino Dep. at 38-42. Vanguard executed five promissory notes in favor of the counterdefendants between March 1, 2001 and June 24, 2001. Dkt. 2 Complaint Exs 4, 5, 7, 13, 16. By June 2001, however, it was obvious to Vanguard, and to

---

[7] Count IV, entitled "Fraudulent Scheme," is simply an amalgam of the fraud and negligence allegations that preceded it, embellished by additional verbiage lifted from the Illinois consumer fraud statute, 815 ILCS 505/2, and a specific reference to the Doe defendants. Dkt. 71 at ¶55; Dkt. 68 at ¶54. Because the count adds nothing new to the claims of common law fraud, Count IV cannot survive summary judgment on Counts I and II.

Pegasus,[8] that Vanguard would not be able to meet its commitments from the March round of deferrals and that still more lessor concessions would be required. Rule 56.1 Statement at ¶¶32, 39-40. The ensuing Vanguard defaults mooted any negotiations toward a new lease. 56.1 Statement at ¶42. At that point, Wiley proffered "the Pegasus proposal": that Vanguard would terminate the two remaining leases and return the planes in "as is/where is" condition in return for $112,000 and a spare engine. Dep. Ex. 14 at 216. Counterdefendants' rejection of this proposal is insufficient to infer a pre-existing intent not to negotiate lease deferrals.

CONCLUSION

The counterclaims are utterly lacking in legal or factual support. Counterdefendants Interlease II, Interlease III and Mimi therefore pray that this court enter summary judgment in their favor and against Counterplaintiffs Pegasus and VAC with respect to Counts I, II and IV of the counterclaims.

Respectfully submitted,

_____
One of the Attorneys for Counterdefendants

ERIC S. PALLES
GARY RAVITZ
RAVITZ & PALLES, P.C.
203 N. LaSalle, Suite 2100
Chicago, IL 60601
(312) 558-1689

---

[8] The record discloses that Vanguard was in constant communication with Pegasus concerning its financial woes. 56.1 Statement at ¶¶39-41. The premise of the counterclaim, that counterdefendants had superior knowledge about Vanguard's operations is patently absurd.