IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| INTERLEASE AVIATION INVESTORS II (ALOHA) L.L.C., an Illinois limited liability company; INTERLEASE AVIATION INVESTORS III (TACA) L.L.C., an Iowa limited liability company; and MIMI LEASING CORP., an Iowa corporation<br><br>Plaintiffs,<br><br>v.<br><br>VANGUARD AIRLINES, INC., a Delaware corporation; PEGASUS AVIATION, Inc., a foreign corporation; VANGUARD ACQUISITION COMPANY, AIRLINE INVESTMENTS INC.; SEABURY GROUP, LLC, a New York limited liability company; and RICHARD S. WILEY<br><br>Defendants | No. 02 C 4801<br><br>Amy J. St. Eve, Presiding Judge<br><br>Edward A. Bobrick, Magistrate |

**FILED** Mar 30 2004 MICHAEL W. DOBBINS U.S. DISTRICT COURT

**DOCKETED** MAR 3 1 2004

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SEABURY GROUP LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, INTERLEASE AVIATION INVESTORS II (ALOHA) L.L.C. ("Interlease II), INTERLEASE AVIATION INVESTORS III (TACA) L.L.C. ("Interlease III") and MIMI LEASING CORP. ("Mimi"), by their attorneys, RAVITZ & PALLES, P.C., in opposition to Defendant SEABURY GROUP, LLC's ("Seabury) motion for summary judgment, state as follows

### NATURE OF THE CASE

Seabury, Vanguard and Pegasus engaged in a scheme to defraud, the object of which was to convince the plaintiffs to defer their rights, pursuant to four written, valid and enforceable airplane lease agreements, to receive payments from Vanguard worth, in the aggregate, many millions of dollars. Seabury initiated contact and met with the plaintiffs, held itself out to as possessing special

expertise and knowledge in the airline business, including such matters as airline financing and fleet planning, and then, through a series of falsehoods and half-truths, intending to convince plaintiffs to defer their contract rights with Vanguard, did convince them to subordinate their rights, thereby causing the plaintiffs to suffer significant financial losses. For its part, Seabury stood to profit from its misconduct by receiving fees and commissions.

## BACKGROUND

Between 1995 and 1997, plaintiffs leased four Boeing 737 aircraft to Vanguard Airlines. Seabury's Statement of Facts ("56.1 Statement) at ¶¶14-16. Three leases (Dkt. 2 Exhibits 1,2,12) were for terms of five years from delivery and, in one case, seven. Dkt. 2 Exhibits 14. The leases were due to expire between 2001 and 2004. Appx. B, Dep. Ex. 95 at SEA 019043.

In May 2000, Seabury was hired by Vanguard to provide advice and services concerning aircraft and capital acquisitions. Plaintiffs' response to Seabury's statement of facts and statement of additonal facts ("Response to Seabury") at ¶ 97. The deal with Vanguard called for Seabury to be paid commissions ranging from $100,000 to $125,000 for each aircraft lease that it helped Vanguard to secure (Id.), and to be paid percentage commissions for each equity and debt placement that it obtained for Vanguard. Id. In or about September 2000, Seabury approached Richard Wiley ("Wiley") ( Dkt. 71 at ¶ 20), the owner of Pegasus, the world's largest private lessor of aircraft, (Dkt. 65 at No. 8) to discuss Vanguard leasing Pegasus planes in exchange for a capital contribution from Pegasus for use by Vanguard. Plaintiffs' Response at ¶ 37.

In December 2000, Pegasus agreed to lease six to eight MD 80 aircraft (the "Lease Transaction"), to loan Vanguard $3 million through a sale and repurchase of its parts inventory by International Aero Components, Inc. ("IAC"), a Pegasus affiliate that Wiley also owned, (the "IAC

2

Transaction"), and to purchase $3 million of Vanguard preferred stock (the "Capital Transaction"). 56.1 Statement, at ¶ 43. The IAC Transaction was signed and funded at the end of 2000. In addition to retentions by IAC of $400,000, the deal resulted in a $620,000 payment to Pegasus. Consequently, of the $3 million, Vanguard got slightly less than $2 million. Plaintiffs' Response at ¶ 106. As part of the IAC Transaction, IAC, in its sole discretion, reserved the right to loan Vanguard additional money. Plaintiffs' Response at ¶ 107.

Vanguard, Seabury and Pegasus had agreed, prior to both the Pegasus lease deal and IAC Transaction, that Vanguard should obtain "loans" in the form of deferred rent payments from the existing lessors of aircraft. Appx. B. Dep. Ex. 97 at SEA 01598. They had also determined between themselves that plaintiffs leases would be prematurely terminated. Dkt. 66 at No. 21, 22. Accordingly, on January 25, 2001, Ellen Artist and Ross MacKenzie of Seabury, and Brian Gillman, Vanguard's General Counsel, came to Chicago in order to convince the plaintiffs to defer rents. Plaintiffs' Response at ¶ 99.

<u>Seabury's Material Misrepresentations, Half-Truths and Omissions</u>

Seabury put on a "road show" presentation for the plaintiffs, providing a written Strategy Update and Presentation (56.1 Statement at ¶ 54, Plaintiffs' Response at ¶ 101), but not before first insisting that plaintiffs execute a confidentiality agreement. Plaintiffs' Response at ¶ 100. Seabury represented that Pegasus had entered into a strategic partnership to lease aircraft to and invest capital in Vanguard. It represented that Pegasus had committed to invest $7 million in Vanguard, of which $4 million had closed, but did not disclose that $3 million of this amount was actually a secured debt and that the remaining $1 million was not a guaranteed loan to Vanguard at all, but, rather, merely an additional sum of money which IAC, in its sole discretion, might loan to Vanguard. Plaintiffs'

3

Response at ¶104. Seabury's oral presentation focused on the upcoming purchase of Vanguard preferred stock by Pegasus. Id. at ¶ 106. Although the Strategy Update purported to forecast Vanguard revenue, by the time Seabury and the plaintiffs met on January 25th, this forecast was already obsolete. In fact, based upon the most recent data concerning Vanguard's operating losses, both Vanguard and Seabury knew by mid-December 2000 that Vanguard's revenues would fall short of this forecast. However, at the meeting with plaintiffs, Artist failed to disclose to them the fact that Vanguard's recent losses had seriously undermined the Strategy Update forecast, but, as part of its "road show", continued to tout it. Plaintiffs' Response at ¶¶ 64, 117-19. In fact, Seabury represented to plaintiffs that the Vanguard revenue projections were reasonable and conservative when they were actually overly optimistic. Plaintiffs' Response at ¶¶ 121-23. Seabury never corrected any of the erroneous or misleading information concerning Vanguard's revenue that it presented to the plaintiffs as part of the January 25th "road show". Id. at ¶120.

Another key aspect of Seabury and Vanguard's presentation involved selling the plaintiffs on the viability of Vanguard's new Kansas City hub strategy. Seabury emphasized the economic benefits of the Kansas City hub strategy to Vanguard, and represented to plaintiffs that KH Group, a route planning specialist, also endorsed this strategy. Plaintiffs' Response at ¶¶ 110-116. In fact, the KH Group did not support the Kansas City hub strategy, due in part to the relatively small size of the Kansas City market and the presence of a Vanguard competitor, Southwest Airlines, in the same market. Id. KH Group actually appears to have been quite critical of the selection of Kansas City as a hub strategy. Id. Further, Seabury left the impression with plaintiffs that Vanguard's implementation of the Kansas City hub strategy was imminent when in fact it was being delayed. Plaintiffs' Response at ¶¶ 34, 64, 112.

4

Seabury and Vanguard represented that Vanguard's strategy would *improve* operating reliability and profitability. The evidence shows, however, that Seabury and Vanguard both knew that Vanguard's strategy for fleet renewal and restructuring would decrease the reliability and profitability of its business in the short term because Vanguard was not yet familiar with the new aircraft and also lacked spare parts. Plaintiffs' Response at ¶ 128.

Seabury also represented to the plaintiffs that the Pegasus capital was sufficient to fund the Vanguard turnaround. Plaintiffs' Response at ¶¶ 129-130. In fact, Vanguard required significantly greater capital, as evidenced by the statements of Vanguard's CEO that $20-30 million could be required to effect a turnaround of Vanguard's fortunes. Appx.B, Dep. Ex 97 at SEA01597. Seabury, in its role as consultant, knew this. Id. Pegasus also knew of Vanguard's plan to seek additional capital beyond the Pegasus commitment. Plaintiffs' Response at ¶¶ 109, 132.

Seabury and Vanguard represented to the plaintiffs that Vanguard's proposed deferral of rents under the aircraft leases was not intended to affect their right to full payment. Seabury and Vanguard disclosed that the plan was to acquire the use of MD80's, but they did not disclose that this plan actually meant that plaintiff's 737's would be replaced by the MD80's. Indeed, Vanguard subsequently proposed to terminate the leases with plaintiffs involving their 912MP and 5WM planes. Seabury Appx. F., Carroll Dep. At 147

Seabury and Vanguard expressly represented to plaintiffs at the January 25th meeting that Vanguard would go bankrupt unless the plaintiffs agreed to defer rental payments, (56.1 Statement at ¶56), when in reality Vanguard had no intention to declare bankruptcy. The evidence shows that a bankruptcy filing was not seriously considered by Vanguard before late February 2001. Appx. B, Dep Ex 97 at SEA01597; Appx. D, Dep Ex. 301, 2/16/01. Moreover, Wiley admits that Pegasus

5

never contemplated providing debtor-in-possession financing to Vanguard: "It was our opinion that a bankruptcy would be very difficult for Vanguard." Seabury Appx. H, Wiley (Oct) Dep. 52. Nevertheless, on February 14, 2001, Seabury threatened plaintiffs that Vanguard would file for Chapter 11 bankruptcy, and Wiley told them that he would provide debtor-in-possession financing to Vanguard. Plaintiffs' Response at ¶137.

<u>Plaintiffs Relied to Their Detriment on Representations Made to Them by Seabury.</u>

Seabury holds itself out to the public as a business with vast experience and special expertise in matters relating to the airline industry, including airline financing.[1] Moreover, in its dealing with plaintiffs, Seabury also touted its turnaround expertise, and its affiliation with a route specialist. Plaintiffs' Response at ¶ 102.

According to Monica Carroll, who attended the January 25th meeting, Ellen Artist's presentation was both persuasive and highly positive: "Seabury described its skills with respect to turning around troubled airlines, it discussed the extensive work that went into creating a strategy,... and highly affirmative statements by Artist about her confidence in the viability of the plan, [was] a strong blessing by a person who held herself out as an industry expert." Plaintiffs' Response at ¶ 126. Seabury's Mahr admits that he had no idea whether the plan would work. Plaintiffs' Response at ¶127.

---

[1] Seabury on its web-site publicizes that its "principals have structured over $75 billion in debt, equity, M&A transactions and strategic affiliations." and that it has experience from worldwide assignments including studies in Asia, Europe, the Middle East, Latin America and Oceania. Seabury lists their airline industry clients to include Air Canada, Air Jamaica, Air Tran, America West Airlines, Inc, Atlas Air Cargo, Avianca, The Boeing Company, Capital Cargo Airlines, Inc., Continental Airlines, Inc., Frontier Airlines, Inc., Great Lakes, Kitty Hawk, Ryanair Holdings plc, Saab Aircraft Corporation, South African Airways, and US Airways. Affidavit of Michael C. Cohen.

The overall presentation led the plaintiffs to conclude that Pegasus had made an equity investment in Vanguard. Plaintiffs' Response at ¶¶ 57-58, 104-05. This was material to the plaintiffs, who knew that Vanguard did not need more debt. Plaintiffs' Response at ¶ 110.

During February 2001, Seabury continued to pursue the lease deferrals from the plaintiffs while simultaneously preparing for the VAC capital transaction involving Pegasus' purchase of Vanguard stock. Seabury was aware that Vanguard's financial situation had continued to deteriorate,[2] yet still failed to correct any of the erroneous or materially misleading representations that it had made to the plaintiffs. Plaintiffs' Response at ¶120. Also, in concert with Pegasus and Wiley, Mahr represented to plaintiffs that Vanguard intended to file for Chapter XI bankruptcy. Through such devices, the defendants were able to secure on March 8, 2001, four agreements in principle whereby plaintiffs agreed to defer lease payments and to modify certain lease terms involving termination and return conditions. The following day, March 9th, Pegasus and Vanguard concluded the VAC capital transaction, whereby VAC purchased $3,250,000 of Vanguard preferred stock. Plaintiffs' Response at ¶ 70.

When the payments to plaintiffs were scheduled to resume in July 2001, Vanguard, now firmly under Pegasus' control, began to default and continued to default on its various promises, until June 24, 2002, when Vanguard tendered the remaining two aircraft to Mimi and Interlease II in an "as-is/where-is" condition.[3] "As is" meant two aircraft in serious disrepair and each missing

---

[2] The record establishes Seabury's intimate, inside relationship between Seabury and Vanguard during this period. In addition to the formulation of strategies for Vanguard and recruitment of its CEO, Vanguard's CFO was a Seabury employee. Plaintiffs' Response at ¶ 48.

[3] While the attacks of September 11, 2001 may have doomed any chance that Vanguard could recover, its inexorable decline precedes those events. Appx. D, Dep. Exs. 161 &184.

one engine. "Where is" meant a hangar in the Arizona desert for which plaintiffs would have to pay storage. Dkt. 95 at ¶37.

## ARGUMENT

### I. SUMMARY JUDGMENT FOR SEABURY SHOULD BE DENIED.

Summary judgment is not a substitute for a trial because issues of material fact predominate. In EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 436 (7th Cir. 2000), the Seventh Circuit observes a "reasonably contestable issue of fact that is potentially outcome-determinative" is enough to defeat summary judgment. There are three such issues in this case involving Seabury.

Moreover, the facts and record evidence are sufficient for a reasonable jury to find for the plaintiffs on the contestable issues. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). For summary judgment, the facts and record evidence must be viewed as a whole and in the light most favorable to the plaintiffs, who also get the benefit of all reasonable inferences. Bay v. Cassens Transport Corp., 212 F.3d 969, 972 (7th Cir. 2000). Seabury's motion for summary judgment fails because it has not proved there is "no reasonable jury [that] could find" for the plaintiffs. See Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995).

### II. SEABURY'S MISREPRESENTATIONS, HALF-TRUTHS AND OMISSIONS

Specifically, a reasonable jury could find here for plaintiffs that:

- Seabury misrepresented that Pegasus committed an equity investment of $7 million to Vanguard, when in fact Pegasus had committed only $3.25 million

- Seabury failed to disclose that Pegasus' "commitment" of $7 million to Vanguard included a $1 million loan to be made at the sole discretion of a Pegasus affiliate, IAC.

- Seabury misrepresented that Vanguard would get $7 million, when Vanguard would only receive about $5.5 million, the remainder to be retained by Pegasus or Pegasus affiliates.

8

- Seabury misrepresented that the infusion of $7 million from Pegasus was sufficient to keep Vanguard's obligations current, whereas it knew that Vanguard actually would require millions of dollars in additional capital to stay current.

- Seabury misrepresented that KH Group supported the Kansas City hub strategy, when just the opposite was true.

- Seabury misrepresented that Vanguard revenue forecasts were conservative and reasonable when in fact the forecasts were overly optimistic.

- Seabury failed to disclose that Vanguard revenue forecasts were obsolete based on available and up-to-date information concerning Vanguard's losses.

- Seabury misrepresented that Vanguard would file for Chapter 11 bankruptcy unless plaintiffs agreed to defer their lease rights whereas Vanguard had no such intention at that time.

- Seabury misrepresented that Vanguard would not terminate plaintiffs' leases whereas Vanguard, Seabury and Pegasus intended and had already agreed that Vanguard would do so.

Seabury's intent or motives in making these misrepresentations present questions of fact that should be tried. Marc Development, Inc. v. Wolin, 904 F. Supp. 777, 784 (N.D. IL 1995). A reasonable jury could find not only that Seabury made intentional misrepresentations to plaintiffs, but did so pursuant to a scheme. Summary judgment is no substitute for a trial of the scheme and fraud counts.

These same facts and circumstances also would permit a reasonable jury to find for plaintiffs that Seabury negligently made one or more misrepresentations. Seabury misstates applicable Illinois law (Seabury Motion for , p. 12), which clearly holds that claims involving negligent misrepresentation only require proof by a preponderance. See Continental Leavitt Communications v. Painewebber, Inc., 857 F. Supp. 1266, 1269-1270 (N.D. IL. 1994). Under the Illinois standard, Seabury obviously is not entitled to summary judgment on this question.

9

### A Reasonable Jury Could Find For Plaintiffs That Seabury Committed Fraudlulent Acts.

Seabury disputes the facts which show that it misled plaintiffs concerning its expertise in fleet planning, the involvement and role of the KH Group in developing and promoting the Kansas City hub strategy, or its own involvement in developing and promoting that strategy. Seabury also flatly denies representing to plaintiffs either that it had expertise in fleet planning or that Pegasus would become a substantial shareholder in Vanguard. Dkt.119 at p.14. Plaintiffs dispute Seabury's assertion that they had access to adequate financial information about Vanguard pursuant to their leases. Id. at 17-18. Plaintiffs' contractual rights to review documents were limited primarily to their own aircraft. Dkt 2, Ex. 1 (Mimi lease) at §8.2. Indeed, at the January 25th meeting, Seabury insisted that plaintiffs execute a confidentiality agreement before it would tender them any documents. These disputed facts issues are not proper candidates for summary judgment.

On the other hand, Seabury does not dispute the fact that it failed to disclose to plaintiffs material terms and conditions concerning the Pegasus equity investment and IAC transactions, contending erroneously that ¶69 of the Complaint "does not allege" differently. Seabury Memorandum, p.13. Of course, a statement which is technically true, yet incomplete, may be fraudulent. "In other words, a half-truth is sometimes more misleading than an outright lie," and can create a false impression Thomas A. Schutz Co. v. Engineering & Testing Servs., 1997 U.S. Dist. LEXIS 10973 at 11-12 (N.D. IL.1997) (Lefkow, M.J.) (citing St. Joseph Hospital v. Corbetta Construction Co., Inc., 21 Ill. App. 3d 925, 952-53, 316 N.E.2d 51, 71 (1st Dist. 1974) and Kleczek v. Jorgensen, 328 Ill. App. 3d 1012, 1020-1021, 767 N.E.2d 913, 920 (4th Dist. 2002)). Seabury initiated the "road show," touted an insider's knowledge of Vanguard's plans and intentions, claimed to possess significant experience and expertise in the airline business, and used its superior

10

position to convince plaintiffs to defer valuable lease rights. Cf. Schrager v. North. Community Bank, 328 Ill. App. 3d 696, 709, 767 N.E.2d 376, 386 (1st Dist. 2002) (bank's representation about individuals who were "excellent real estate developers, [and] very good customers," triggered a duty to fully disclose information about such individuals to plaintiff since it had superior knowledge both of the developers' financial histories and the subject real estate development). In Illinois, the failure to provide complete or adequate information is actionable fraud if the defendant had the duty to communicate it. See e.g. Cahill v. Eastern Ben. Systems, Inc., 236 Ill. App. 3d 517, 521, 603 N.E. 2d. 788,(Ill App. 1992) (citing Board of Education v. A, C, & S, Inc., 131 Ill. 2d 428, 546 N.E.2d 580 (1989)). Because a reasonable jury could find that Seabury intended plaintiffs should rely on its representations, it had the clear duty to disclose the truth. Accordingly, there is no requirement that plaintiffs show Seabury actively concealed the truth. See Lefebvre Intergraphics v. Sanden Machine, Inc., 946 F. Supp. 1358, 1366 (N.D. IL. 1996). Even if there were such a requirement here, a reasonable jury could still find for plaintiffs that Seabury had actively concealed material facts. See Go for It, Inc. v. Aircraft Sales Corp., 2003 U.S. Dist. LEXIS 11043 (N.D. IL. 2003).

### A Reasonable Jury Could Find For Plaintiffs That Seabury Was Engaged In A Scheme.

Seabury, Vanguard and Pegasus engaged in a scheme to defraud plaintiffs with its object being to get plaintiffs to agree to defer their valuable lease rights while Pegasus and Vanguard positioned themselves to terminate the leases and substitute Pegasus aircraft for plaintiffs' aircraft.

For its part, Seabury helped concoct this scheme and then engaged in a pattern of conduct to make it succeed. This pattern includes: preparing and presenting certain documents to plaintiffs in connection with the January 25th meeting, which contained obsolete and materially misleading information about Vanguard's finances; initiating and conducting the "road show" presentation that is described in detail herein; and failing to disclose the truth when events subsequent to January 25th

11

required that such disclosures be made. There is a clear temporal proximity between these events, the execution of the agreements-in-principle that occurred on March 8, 2001, and the effective takeover of Vanguard by Pegasus and Wiley the very next day. AAR Int'l, Inc. v. Vacances Heliades S.A., 202 F. Supp. 2d 788, 799 (N. D. Ill. 2002) (Bucklo, J).

As part of a "larger pattern of deceptions or enticements that reasonably induces reliance," (Desnick v. American Broadcasting Co., Inc., 44 F.3d 1345, 1354 (7th Cir. 1995); Zenith Elecs. Corp. v. WH-TV Broad. Corp., 2002 U.S. Dist. LEXIS 12638 (N.D. IL 2002)), three acts stand out: First, Seabury falsely represented to plaintiff's that without agreements to defer the lease rights, Vanguard would declare bankruptcy. A reasonable jury could find that Seabury's use of this false threat of bankruptcy to coerce the subsequent agreements was part of a scheme to defraud. Second, Seabury falsely represented to plaintiffs on January 25th that Vanguard did not intend to terminate plaintiffs' leases, or to replace their planes with planes owned by Wiley and Pegasus, when, as Wiley himself has acknowledged, such a plan was already in place no later than December 2000. A reasonable jury could find that Seabury's misrepresentations in this regard were part of the scheme that helped cause plaintiffs to defer their rights and facilitated the improper termination of their leases with Vanguard and led to the trashing and replacement of plaintiffs' planes with planes owned by Wiley and Pegasus.

Third, although Seabury knew by December 2000 that the Vanguard financial forecasts contained in the documents which it tendered to plaintiffs on January 25th were materially misleading, it nonetheless touted them as being conservative and reliable, when in fact they were not, and failed to inform plaintiffs subsequent to this meeting that Vanguard's financial position continued to deteriorate. See Peddinghaus v. Peddinghaus, 314 Ill. App. 3d 900, 905, 733 N.E.2d 797, 801 (1st Dist. 2000) ("A party who makes a statement which at the time is true, but who

12

subsequently acquires new information that makes it untrue or misleading, must disclose such information to anyone whom he knows to be acting on the basis of the original statement or be guilty of fraud.")

"While there is no general duty to disclose financial projections, it is 'axiomatic that once a company undertakes partial disclosure of such information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading.'" Endo v. Albertine, 863 F. Supp. 708, 721 (N.D. Ill, 1994) (citing Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir.), cert. denied, 454 U.S. 1092, 70 L. Ed. 2d 631, 102 S. Ct. 658 (1981)). And, when a party who purports to base a prediction upon expertise or special knowledge that, in fact, does not exist, he may be liable for fraud. See Gottreich v. San Francisco Inv. Corp., 552 F.2d 866, 867 (9th Cir. 1977). Finally, when a representation is made by professionals or those with greater access to information than the recipient, there may be an obligation to disclose data indicating that the opinion or forecast may be doubtful. Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985), *cert. denied sub nom.* Wasserstrom v. Eisenberg, 474 U.S. 946, 106 S. Ct. 343, 88 L. Ed. 2d 290, 106 S. Ct. 342 (1985). Indeed, because a reasonable jury could find that the underlying basis for the projections was false and that Seabury knew it, its conduct in regard to such forecasts was actionable fraud and part of a scheme. See eOnline v. Chicago Consulting Partners, 2002 U.S. Dist. LEXIS 5464, 10-11 (N.D. IL. 2002); Peterson v. Baloun, 715 F. Supp. 212, 216 (N.D. Ill. 1989) ("Because defendants' representations were allegedly the vehicle through which they set their scheme in motion, plaintiffs have stated a claim for fraud in the inducement."); Steinberg v. Chicago Medical School, 69 Ill. 2d 320, 371 N.E.2d 634 (1977); Lyon Van Lines, Inc. V. Advanced Sys., 1985 U.S. Dist. LEXIS 14614 (N.D. IL. 1985).

13

The plaintiffs can prove loss causation. Loss causation is satisfied when "the very facts about which the defendant lied which caused its injuries" Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649(7th Cir., 1997). Unlike in Movitz, cited by Seabury, the losses sustained by the plaintiffs directly relate to Seabury's misrepresentations. In Movitz, the alleged fraudulent conduct related to the structural condition of a building while the loss was a result of a real estate market crash. 148 F.3d 760, 765 (7th. Cir 1998). Here there is loss causation because Plaintiffs losses directly relate to Seabury's fraudulent conduct in this regard: had plaintiffs not allowed Vanguard the time to recover, and taken the planes back in early 2001, their subsequent loss in value could have been mitigated. Vanguard's inexorable downfall could have been anticipated and the loss avoided if plaintiffs had access to adequate information upon which to base their decision to defer.

Finally, while Seabury tries to bundle the negligence and fraud claims, a distinction must be made: in negligence cases, the negligence of both parties is compared. Thus, if a reasonable jury could find that plaintiffs are partially responsible for their loss, summary judgment is inappropriate and instead the plaintiff's partial reliance would go to the reduce the damages by reason of their comparative negligence.[4]  See Greycas, Inc. v. Proud, 826 F.2d 1560, 1565-1566 (7th Cir., 1987)(Judge Posner stating that comparative negligence applies to negligent misrepresentation).

---

[4]In Illinois, "pure" comparative negligence applies to negligent misrepresentation. In 1981 in Alvis v. Ribar, the Illinois Supreme Court held that "pure" comparative negligence was a defense in negligence causes of action. 85 Ill. 2d 1, 421 N.E.2d 886, 52 Ill. Dec. 23 (1981). After the Supreme Court's holding in Alvis v. Ribar, the Illinois legislature passed a "modified" comparative negligence statute (a negligent plaintiff may recover, but only so long as the percentage of his fault does not exceed 50 percent of the total), but that statute only applies to "actions on account of bodily injury or death or physical damage to property." 735 ILCS 5/2-1116. Negligent misrepresentation is an action for economic loss and, therefore, the statute does not apply and, as a result, the holding in Alvis v. Ribar remains Illinois law for negligent misrepresentation. .

14

## III. CONCLUSION

Seabury freely admits that it engaged in a scheme with Vanguard and Pegasus, but its hyperbolic characterization of its participation in this scheme as part of some heroic and "Herculean" proportions to save a struggling airline from its greedy creditors, conveniently ignores reality. This reality, based upon the facts and record evidence, shows that Seabury's participation was motivated by the prospect that it would make enormous profits through the fees it was charging Vanguard for its "expertise", its right to a piece of the action from any new Vanguard investor and the six-figure commissions it stood to earn with every new plane lease. A reasonable jury not only could find that Seabury's conduct was undertaken fraudulently or negligently. The fundamental dichotomy between Seabury views of this case and plaintiffs view is sufficient reason let a jury decide.

Respectfully submitted,

One of Plaintiifs' Attorneys

ERIC S. PALLES
GARY RAVITZ
RAVITZ & PALLES, P.C.
203 N. LaSalle, Suite 2100
Chicago, IL 60601 (312) 558-1689

# SEE CASE FILE FOR EXHIBITS

