# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4801 | **DATE** | 5/19/2004 |
| **CASE TITLE** | Interlease Aviation vs. Vanguard AL Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Seabury's motion for summary judgment (R. 119-11) is granted. Defendant Wiley's motion for summary judgment (R. 132-1) is granted. Plaintiff's motion for partial summary judgment (R. 124-1) is granted in part and denied in part as to Count IV of the counterclaim, and Plaintiffs motion for partial summary judgment on the pleadings (R. 122-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 20 2004 | |
| | Docketing to mail notices. | | date docketed | 167 |
| | Mail AO 450 form. | | JXM | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice | |
| TH ✓ | courtroom deputy's initials | 2004 MAY 13 PM 3: 15 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

MAY 2 0 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

INTERLEASE AVIATION INVESTORS II )
(ALOHA) L.L.C, INTERLEASE AVIATION )
INVESTORS III (TACA) L.L.C., and MIMI )
LEASING CORP., )
                )
        Plaintiffs, )
                )     No. 02 C 4801
     v. )
                )
VANGUARD AIRLINES, INC., PEGASUS )
AVIATION, INC., VANGUARD ACQUISITIONS )
COMPANY, AIRLINE INVESTMENTS, INC., )
SEABURY GROUP, LLC, and RICHARD S. )
WILEY, )
        Defendants. )
_____ )
                )
PEGASUS AVIATION, INC. and VANGUARD )
ACQUISITION COMPANY, )
                )
        Counter-Plaintiffs, )
                )
     v. )
                )
INTERLEASE AVIATION INVESTORS II )
(ALOHA) L.L.C., INTERLEASE AVIATION )
INVESTORS III (TACA) L.L.C., MIMI )
LEASING CORP., PHILIP COLEMAN, and )
DOES 1 through 5, inclusive, )
                )
        Counter-Defendants. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

      Plaintiffs Interlease Aviation Investors II (ALOHA) L.L.C. ("Interlease II"), Interlease

Aviation Investors III (TACA) L.L.C. ("Interlease III"), and Mimi Leasing Corp. ("Mimi")

(collectively, "Plaintiffs") filed an eight-count Fifth Amended Complaint ("FAC") against

167

Vanguard Airlines, Inc. ("Vanguard"), Pegasus Aviation, Inc. ("Pegasus"), Vanguard Acquisition

Company ("VAC"), Airline Investments, Inc. ("AII"), Seabury Group, LLC ("Seabury"), and

Richard S. Wiley ("Wiley") (collectively, "Defendants").

In Counts I-III, Plaintiffs allege breach of contract against Vanguard. In Count IV,

Plaintiffs allege fraud against Vanguard and Seabury, and in Count V, they allege negligent

misrepresentation against Vanguard and Seabury. In Count VI, Plaintiffs allege tortious

interference with contractual relations against Pegasus, VAC, AII, and Wiley (collectively, the

"Pegasus Parties"). In Count VII, Plaintiffs allege unjust enrichment against the Pegasus Parties.

In Count VIII, Plaintiffs allege a fraudulent scheme against all Defendants.

Pegasus filed a four-count counterclaim against Interlease II, Interlease III, and Mimi

("Counterdefendants"),[1] alleging intentional fraud (Counts I and II), negligent misrepresentation

(Count III), and fraudulent scheme (Count IV). (R. 71-1, Corrected Countercl.) Intervenor[2]

VAC asserted identical counts in a four-count complaint. (*Compare* R. 71-1, Corrected

Countercl., *with* R. 68-1, Compl. in Intervention.) The parties do not separately address

Pegasus's Corrected Counterclaim and VAC's Complaint in Intervention in their briefs. For ease

of reference, the Court adopts the parties' convention and generally refers to the four counts as

Pegasus and VAC's "Counterclaim."

Four motions are currently before the Court. The Pegasus Parties filed a motion for

---

[1] Pegasus and VAC also named Philip Coleman and five John Doe counterdefendants in their counterclaim. Coleman and the Five Does filed a motion to dismiss the counterclaim against them pursuant to Federal Rule of Civil Procedure 12(b)(5). The Court granted the motion to dismiss on March 1, 2004. (R. 118-1, Minute Order.)

[2] The Court granted VAC leave to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a) on June 12, 2003. (R. 69-1, Order (J. Alesia).)

summary judgment as to Counts VI, VII, and VIII of the FAC. Seabury moved for summary judgment as to Counts IV, V, and VIII of the FAC. Counterdefendants filed a motion for partial summary judgment as to Counts I, II, and IV of the Counterclaim, and a motion for judgment on the pleadings as to Count III of the Counterclaim.

For the reasons stated herein, the Pegasus Parties' motion for summary judgment is granted as to Count VI (tortious interference), Count VII (unjust enrichment), and Count VIII (fraudulent scheme) of the FAC. Seabury's motion for summary judgment is granted as to Count IV (fraud), Count V (negligent misrepresentation), and Count VIII (fraudulent scheme) of the FAC. Counterdefendants' motion for summary judgment is granted as to Counts I and II (fraud) and Count III[3] (negligent misrepresentation), and denied in part as to Count IV (fraudulent scheme).

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

---

[3] The Court converted Counterdefendants' motion for judgment on the pleadings into a motion for summary judgment. *See Massey v. Helman*, 259 F.3d 641, 646 (7th Cir. 2001).

3

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. The party seeking summary judgment has the

burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). A party will successfully oppose summary

judgment only if it presents "definite, competent evidence to rebut the motion." *Equal*

*Employment Opportunity Comm'n v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The

Court "considers the evidentiary record in the light most favorable to the nonmoving party, and

draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F .3d 467,

471 (7th Cir. 2002).

## BACKGROUND

### I.    The Parties

Plaintiff Interlease II is an Illinois limited liability corporation with its principal place of

business in Northfield, Illinois. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 1; R. 145-1, Pls.'

Resp. to Pegasus's Rule 56.1 Statement ("Pls.' Rule 56.1 Resp."), ¶ 1.) Its members are citizens

of Illinois and Iowa.[4] (R. 91-1, FAC ¶ 1.) Plaintiff Interlease III is an Iowa limited liability

corporation with its principal place of business in Northfield, Illinois. (R. 134-1, Pegasus's Rule

56.1 Statement, ¶ 1; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 1.) Its members also are citizens of

Illinois and Iowa. (R. 91-1, FAC ¶ 2.) Plaintiff Mimi is an Iowa corporation with its principal

place of business in Dubuque, Iowa. (R. 134-1, Pegasus Parties' Rule 56.1 Statement, ¶ 1; R.

145-1, Pls.' Rule 56.1 Resp., ¶ 1.) Interlease II, Interlease III, and Mimi are engaged in the

business of leasing commercial aircraft. (R. 134-1, Pegasus Parties' Rule 56.1 Statement, ¶ 1; R.

---

[4] For purposes of determining diversity jurisdiction, limited liability corporations are
citizens of every state of which any member is a citizen. *Belleville Catering Co. v. Champaign
Market Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003).

145-1, Pls.' Rule 56.1 Resp., ¶ 1.)

Defendant Vangaurd was a Delaware corporation with its principal place of business in Kansas City, Missouri. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 2; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 2.) Vanguard was a passenger airline which, at various times, leased commercial aircraft from Plaintiffs and Pegasus. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 2; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 2.) At all relevant times, Vanguard was a publicly traded company with its own management and an independent Board of Directors. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 63; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 63.) Vangaurd shares were at all times publicly traded on the Nasdaq SmallCap Market under the ticker symbol "VNGD." (R. 152-1, Seabury's Reply to Pls.' Resp. to Seabury's Rule 56.1 Statement ("Seabury's Rule 56.1 Reply"), ¶¶ 18, 20; R. 144-1, Pls.' Resp. to Seabury's Rule 56.1 Statement of Facts ("Pls.' Rule 56.1 Resp. to Seabury"), ¶¶ 18, 20.)

Defendant Pegasus is a California corporation with its principal place of business in San Francisco, California, and is engaged in the business of leasing aircraft. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 4; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 4.) Defendant Richard S. Wiley is a California citizen and at all relevant times served as president, CEO, and a director of Pegasus. (*Id.* ¶ 6.) Defendant VAC is a Delaware corporation with its principal place of business in San Francisco, California, and at certain relevant times, owned shares in Vanguard. Defendant AII is a Delaware corporation with its principal place of business in San Francisco, California. (*Id.* ¶ 5.) AII owns 100% of the stock of VAC. (R. 91-1, FAC ¶ 9.) As noted, the Court refers to Pegasus, VAC, AII, and Wiley collectively as the "Pegasus Parties."

Defendant Seabury is a Delaware limited liability company with its principal place of

business in Stamford, Connecticut. (*Id.* ¶ 11.) Its sole member is a New Jersey citizen. (*Id.* ¶ 11.) Seabury is engaged in the investment banking business. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 3; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 3.)

## II.    Vanguard's Business Plan

Plaintiffs leased four aircraft to Vanguard.[5] Vanguard experienced financial difficulties almost from the outset of its operations and had fallen behind on lease rental payments to Plaintiffs under the Leases by March 2000. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 8; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 8.) In mid 2000, Vanguard engaged Seabury, an investment-banking firm that specialized in aviation industry financing, for the purpose of raising capital and acquiring new aircraft for Vanguard. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 29; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 29.) Seabury recommended, *inter alia*, that Vanguard develop a business plan. (*Id.* ¶ 30.)

In mid to late 2000, Vanguard developed a Business Plan to restructure its operations. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 9; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 9.) Under the Business Plan, Vanguard planned to change its flight schedules, passenger routes, capacity, and aircraft fleet in order to transform Vanguard from a predominantly short-to-medium haul airline to a hub-and-spoke operator. (*Id.*) The Business Plan contemplated that Vanguard would phase

------

[5] Plaintiffs' leases to Vanguard include:  (1) an Aircraft Lease Agreement with Mimi for a Boeing 737 aircraft, U.S. Registration No. N603DJ, entered on December 11, 1995; (2) a second Aircraft Lease Agreement with Mimi for a Boeing 737 aircraft, U.S. Registration No. N912MP, entered on November 18, 1997; (3) an Aircraft Lease Agreement with Interlease III for Boeing 737 aircraft, U.S. Registration No. N620PC, entered on May 30, 1997; and (4) an Aircraft Lease Agreement with Interlease II for a Boeing 737 aircraft, U.S. Registration No. N5WM, entered on September 18, 1997 (collectively, the "Leases"). (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 2; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 2.)

out, over time, the airline's existing aged, inefficient, and high maintenance aircraft like those that Vanguard leased from Plaintiffs, and replace it with new, larger aircraft from a lessor such as Pegasus. (*Id.* ¶ 10.) Vanguard retained the Kiehl Hendrickson Group ("KH Group") to prepare an assessment of hub opportunities for Vanguard. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 32; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 32.) Vanguard management chose, and its Board of Directors approved, the Kansas City hub strategy over other alternatives. (*Id.* ¶ 33.)

Vanguard presented the Business Plan to Pegasus in September 2000. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 11; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 11.) Thomas Mahr of Seabury contacted Wiley of Pegasus in October or November 2000 to discuss leasing aircraft to Vanguard. (*Id.*) Pegasus responded with a proposal for the lease of six to eight MD-80 aircraft, and Vanguard countered that, in order to go forward with the lease deal, Vanguard would also need an equity contribution from Pegasus. (*Id.*)

## III.    The Letter Agreement, Lease Deal, Inventory Deal, And Stock Deal Between Vanguard and Pegasus

On December 1, 2000, Vanguard and Pegasus signed a Letter Agreement which, among other things, committed Pegasus to lease to Vanguard at least six (and up to eight) MD-80 aircraft, plus certain spare engines (the "Lease Deal"). (*Id.* ¶ 12.) The Letter Agreement further provided that Pegasus would loan Vanguard up to $4.0 million to be secured by Vanguard's spare parts inventory (the "IAC Inventory Loan"). (*Id.* ¶ 13.) The IAC Inventory Loan closed in December 2000, and International Aero Components ("IAC"), an aircraft parts company owned in part by Wiley, funded the first $3.0 million at that time. (*Id.*) The IAC transaction provided Vanguard the ability to borrow an additional $1 million for a total of $4 million. (*Id.*) The Letter

Agreement further committed Pegasus to make a $3 million equity investment in Vanguard (the "Stock Deal"), provided that the parties could agree upon certain terms and conditions. (*Id.* ¶ 14.) Pegasus formed VAC as the investment vehicle to take and hold the Vanguard shares issued pursuant to the Stock Deal. (*Id.*) As a pre-condition to closing the Stock Deal, Vanguard agreed to reach satisfactory agreements with all of its existing lessors (including Plaintiffs) for lease deferrals. (*Id.* ¶ 15.)

The Business Plan that Vanguard and Seabury presented to Pegasus in September 2000 contemplated that Vanguard would terminate certain 737 leases early. (*Id.* ¶¶ 10, 15.) Specifically, the Business Plan provided that Vanguard would retire all of its 737 aircraft by the end of 2004, even though several 737 leases extended beyond that time. (*Id.*)

## IV.    The Chicago Meeting

In January 2001, Vanguard began seeking lease deferrals or early lease terminations from its existing aircraft lessors, including Plaintiffs, to address its short-term cash flow problems. (*Id.* ¶¶ 15-16.) In late January 2001, Vanguard's and Seabury's representatives met with Plaintiffs' representatives in Chicago at the law offices of Plaintiffs' counsel, Monica Carroll[6] (the "Chicago meeting"). (*Id.* ¶ 17.) Plaintiffs' representatives included Philip Coleman, David Coleman (Philip's son), and Carroll. (*Id.*) Defendants' representatives included Ellen Artist and Ross MacKenzie of Seabury, and Vanguard's vice president and general counsel, Brian Gillman. (*Id.*) The Pegasus Parties did not participate in the Chicago Meeting, although they were aware that Vanguard was communicating with its other lessors about lease deferrals.

---

[6] Carroll has extensive experience in commercial aircraft leasing and aviation financing, and was at all relevant times married to Coleman. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 18; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 18.)

At the meeting, Vanguard provided Plaintiffs' representatives with two documents: the "Vanguard Airlines Strategy Update January 2001"[7] (the "Strategy Update") and the "Vanguard Airlines Presentation to Mimi Leasing & Interlease Aviation January 2001" (the "Coleman Lease Deferral Request"). (R. 152-1, Seabury's Rule 56.1 Reply ¶ 54; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 54.) MacKenzie presented the Strategy Update on behalf of Seabury. (*Id.*) Artist and Gillman discussed the specific lease deferrals that Vanguard sought from Plaintiffs, as well as the dire financial condition of the company. (*Id.* ¶ 55.) Specifically, Artist and Gillman informed Plaintiffs that: (1) Vanguard was insolvent and could not meet its current obligations; (2) Vanguard had retained Seabury to provide financing expertise; (3) Vanguard had strategic plans to ensure reliability and to reduce costs by converting its fleet to a different type of aircraft to be leased from Pegasus; (4) Vanguard had a commitment from Pegasus to invest "$7 million in capital" in Vanguard; (5) Pegasus committed to invest approximately $3 million of additional capital, contingent upon Plaintiffs' deferral of Vanguard's lease obligations; (6) Vanguard's economic survival depended upon Plaintiffs deferring Vanguard's lease obligations as to two aircraft; and (7) as a result of Pegasus's investment in Vanguard, Pegasus would become a substantial Vanguard shareholder.

Plaintiffs' representatives at the meeting asked few, if any, questions. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 60; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 60.) Plaintiffs did not ask any representative of Vanguard or Seabury whether the "$7 million in capital" comprised equity, debt, or some combination of the two. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 22; R.

---

[7] Vanguard and the KH Group provided all of the information contained in the Strategy Update and the individual lease deferral request. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 48; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 48.)

145-1, Pls.' Rule 56.1 Resp., ¶ 22.)

After the meeting, Plaintiffs thoroughly read and discussed the presentation materials.

(*Id.* ¶ 21.) Carroll testified that she did not recall discussing or explaining any of the material to

her husband. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 58; R. 144-1, Pls.' Rule 56.1 Resp. to

Seabury, ¶ 58.) Plaintiffs never engaged a third party to evaluate or provide an opinion on any of

the information contained in the Strategy Update or Coleman Lease Deferral Proposal. (R. 152-

1, Seabury's Rule 56.1 Reply ¶ 62; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 62.)

## V.     The February Conference Call

In mid-February 2001, Mahr (Seabury's representative), Wiley (Pegasus's representative),

and Coleman (Interlease's representative) discussed the Lease Deal and Stock Deal during a

conference call. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 29; R. 145-1, Pls.' Rule 56.1 Resp.,

¶ 29.) Wiley represented during the call that Pegasus and VAC were "serious" about completing

the transactions. (*Id.*) Wiley represented that Vanguard would file for bankruptcy unless

Plaintiffs cooperated with the lease deferrals. (R. 145-1, Pls.' Rule 56.1 Resp., ¶ 29.) Coleman

represented that Plaintiffs believed in the Business Plan and would cooperate in the Lease

Deferral program. (R. 126-1, Counterdefs.' Mem. in Supp. of Part. Summ. J., at 4.)

## VI.    The Agreements In Principle

On March 8, 2001, Plaintiffs executed four "Agreements in Principle" which

contemplated that within two weeks the parties would reach final agreements for Plaintiffs to:

(1) accept the early return of two aircraft, and (2) agree to defer certain payments under the

Leases as to the remaining two aircraft. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 30; R. 145-

1, Pls.' Rule 56.1 Resp., ¶ 30.) The Agreements in Principle further obligated Vanguard to

provide each Plaintiff with a Promissory Note for the deferred lease payments (the "Promissory Notes"). (*Id.* ¶ 31.) The next day, March 9, 2001, VAC paid $3.25 million for 300,000 shares of Vanguard preferred stock pursuant to the Stock Deal. (*Id.* ¶ 32.) Later that day, VAC received copies of the Agreements in Principle signed by Plaintiffs. (*Id.*) After the Plaintiffs executed the Agreements in Principle, Seabury had no further contact with Plaintiffs. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 71; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 71.)

## VII.    Vanguard's Further Financial Troubles

Vanguard continued to have difficulty meeting its short-term payment obligations to lessors and other creditors, and by the end of April 2001 Vanguard concluded that it would need further financing. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 34; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 34.) In May 2001, VAC agreed to purchase an additional $3.5 million in Vanguard stock. (*Id.* 38.) In May and June 2001, Plaintiffs and Vanguard belatedly finalized the Promissory Notes contemplated in the Agreements in Principle. (*Id.* 35.) David Rescino, Vanguard's CFO, determined that it was necessary for Vanguard to obtain yet another set of lease deferrals from its lessors. (*Id.* 39.) Rescino made a number of proposals to Plaintiffs and other lessors. (*Id.* 40.) Plaintiffs refused to enter into another set of lease deferral terms with Vanguard. (*Id.*)

On or about July 18, 2001, after denying Rescino's requests for further lease deferrals, Plaintiffs served Notices of Default on Vanguard with respect to the Leases of the two remaining Leased aircraft, thereby perfecting their right to repossess the two aircraft. (*Id.* ¶ 41.) Plaintiffs did not rescind or remove these Notices of Default at any relevant time. (*Id.* ¶ 48.)

## VIII.   The July-August Negotiations

At or about that time, Vanguard asked Wiley to identify an alternative approach for Vanguard to resolve its Lease obligations to Plaintiffs. (*Id.* ¶ 45.) Accordingly, in late July and again in August 2001, Wiley met with Plaintiffs' representative Coleman. (*Id.*) Rescino was in charge of Vanguard's efforts to negotiate further financial restructurings with Plaintiffs. (R. 152-1, Seabury's Rule 56.1 Reply, ¶ 85.) Wiley met with Coleman in Illinois at Palwaukee Airport on July 26, 2001. (R. 152-1, Seabury's Rule 56.1 Reply ¶ 88; R. 144-1, Pls.' Rule 56.1 Resp. to Seabury, ¶ 88.) Wiley and Coleman met again on August 9, 2001. (*Id.*) Wiley and Coleman could not agree on a solution, and no settlement, restructuring, or other agreement resulted from these discussions. (R. 134-1, Pegasus's Rule 56.1 Statement, ¶ 46; R. 145-1, Pls.' Rule 56.1 Resp., ¶ 46.)

## IX. Vanguard's Bankruptcy

Vanguard filed for Chapter 11 bankruptcy on July 30, 2002. (*Id.* ¶ 72.) At that time Vanguard had outstanding debts to Plaintiffs of approximately $6.5 million, and to Pegasus of over $61 million. (*Id.* ¶ 73.) On September 11, 2002, Vanguard filed a notice of bankruptcy with the Court. (R. 7-1, Notice of Bankruptcy.) Plaintiffs' claims against Vanguard are subject to an automatic stay pursuant to 11 U.S.C. § 362(a).

The Court has jurisdiction over the principal action and the counterclaim pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs-Counterdefendants and Defendants-Counterplaintiffs, and the amount in controversy of both the principal action and the counterclaim exceeds $75,000. Venue is proper under 28 U.S.C. § 1391(a). (R. 28-1, Order at 23 (J. Alesia).)

12

## ANALYSIS

I. **The Pegasus Parties' Motion for Summary Judgment As To Counts VI, VII, And VIII Of The FAC**

A. **Count VI: Tortious Interference With Contractual Relations**

Plaintiffs allege that the Pegasus Parties tortiously interfered with its Leases with Vanguard. To prevail on a tortious interference claim under Illinois law,[8] a plaintiff must prove: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-55, 545 N.E.2d 672, 676 (Ill. 1989); *Cook v. Winfrey*, 141 F.3d 322, 327-28 (7th Cir. 1998). To survive summary judgment, Plaintiffs must establish a genuine issue of material fact as to the elements. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999); *see generally Common v. Williams*, 859 F.2d 467, 469 (7th Cir. 1988) ("Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof.").

The Pegasus Parties argue that Plaintiffs cannot prevail on their tortious interference claim as a matter of law because (1) their conduct was privileged and justified, and (2) their

---

[8] The parties agree that Illinois law governs the substantive issues in this case. (R. 133-1, Pegasus's Mem. in Supp. of Summ. J., 6 n.3.) Because all parties rely on Illinois law, and because federal courts sitting in diversity apply the substantive law of the state in which the suit was brought, *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 478 n.4 (7th Cir. 1997), the Court applies Illinois law to the parties' claims. *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 849 (7th Cir. 1999).

conduct did not cause Vanguard to breach its obligations under the Leases.[9]

### 1. The Pegasus Parties' Alleged Misconduct

Plaintiffs fail to clearly identify in their summary judgment papers the particular conduct that forms the basis of their tortious interference claim. After digging through the statements of fact, the Court identified all of the facts relating to the Pegasus Parties' conduct. The Court addresses those facts, drawing all inferences in Plaintiffs' favor.

#### a. Vanguard's Alleged Breaches

It is undisputed that Vanguard breached its contractual obligations to Plaintiffs. Neither party, however, identifies the precise nature of Vanguard's breaches in their summary judgment papers.

In the FAC, Plaintiffs allege that Vanguard breached its obligations under the Leases, Agreements in Principle, and Promissory Notes by failing to make required payments. (R. 91-1, FAC, Count I, ¶ 24 (Mimi), Count II, ¶ 43 (Interlease III), Count III, ¶ 51 (Interlease II) ("Vanguard breached both Leases by, among other things, failing to pay rents and maintenance reserves.").)[10] Plaintiffs appear to further allege in the FAC that Vanguard breached its obligations under the Agreements in Principle by failing to satisfy the terms of the early termination agreement before Vanguard terminated the Leases. (*Id.* ¶¶ 34-37, 58-61.)

---

[9] The Pegasus Parties do not dispute that Plaintiffs and Vanguard had valid contracts, that the Pegasus Parties were aware of those contracts, that Vanguard breached its contractual obligations to Plaintiffs, or that Vanguard's breaches damaged Plaintiffs.

[10] "Maintenance reserves" are cash payments that an aircraft lessee pays to an aircraft lessor on a periodic basis. The lessor holds the payments, and, under certain circumstances, the lessor returns the money to the lessee as reimbursement for certain heavy maintenance checks and repairs that the lessee performed. (R. 161-1, Pegasus's Rule 56.1 Reply, ¶ 31.)

### b. The Pegasus Parties' Alleged Misconduct With Respect To Vanguard's Alleged Breaches

Plaintiffs do not specify in their summary judgment papers which Vanguard breaches the Pegasus Parties allegedly caused or induced. Plaintiffs appear to argue that the Pegasus Parties tortiously interfered with Plaintiffs' Leases by asserting control over Vanguard and requiring Vanguard to obtain lease deferrals and early lease terminations from Plaintiffs as conditions precedent to VAC's Stock Deal and Pegasus's Lease Deal.

The following facts appear to support Plaintiffs' argument. Mahr and Wiley spoke with Coleman on February 14, 2001 and threatened Coleman that Vanguard would file for bankruptcy and that Wiley would provide debtor-in-possession financing unless Plaintiffs agreed to the lease deferrals. In July and August 2001, Wiley took over negotiations with Coleman, allegedly without any input from Vanguard's officers, and laid out the terms under which Vanguard would perform. On or about July 26, 2001, Wiley traveled to Illinois to meet with Coleman, and told Coleman that Vanguard would breach its commitments to Plaintiffs and that Plaintiffs had to accept a new proposal significantly curtailing Plaintiffs' rights. Vanguard's CFO Rescino sent weekly cash flow reports to Brad Larson, a Pegasus Vice President responsible for credit management vis a vis Vanguard. The Pegasus Parties participated in the hiring of Vanguard personnel, including Vanguard's new CEO and other employees. Larson, in his capacity as Pegasus's credit manager with respect to Vanguard, tendered an employment contract to Rocky Spane, the Chairman of Vanguard's board. In sum, Plaintiffs argue that Wiley and Pegasus controlled Vanguard, or at least, "Vanguard showed 'extreme deference' to the views of Wiley and Pegasus." (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J. at 7.)

## 2. The Pegasus Parties' Conduct Was Privileged And Plaintiffs Cannot Establish That This Conduct was Unjustified

As already noted, Plaintiffs must establish a genuine issue of material fact as to each of the five elements of a tortious interference claim. *Shank*, 192 F.3d at 681. The Pegasus Parties argue that even if they had engaged in the alleged conduct, Plaintiffs' tortious interference claim fails as a matter of law because Plaintiffs cannot establish the third factor—that the Pegasus Parties' actions were unjustified. The Court agrees. To determine whether the Pegasus Parties' alleged interference was unjustified, the Court must first determine whether the Pegasus Parties had a conditional privilege to interfere. *HPI Health Care Servs.*, 131 Ill. 2d at 156, 545 N.E.2d at 677.

### a. The Pegasus Parties' Conduct Was Privileged

Illinois courts recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights. *Prince v. Zazove*, 959 F.2d 1395, 1397 (7th Cir. 1992); *HPI Health Care Servs.*, 131 Ill. 2d at 156, 545 N.E.2d at 677; *Connaughton v. Gertz*, 94 Ill. App. 3d 265, 269-70, 418 N.E.2d 858, 861 (Ill. App. Ct. 1981) ("Though contractual relationships are protected from third party interference, in many cases the third party may be privileged to purposely bring about the breach of plaintiff's contract with another.").

In this case, the Pegasus Parties and Plaintiffs each entered into contracts with Vanguard. Due to its financial troubles, Vanguard could not meet its contractual obligations to either the Pegasus Parties or Plaintiffs. The parties' contractual rights with respect to Vanguard necessarily conflicted because they were competing for payments from the same cash-strapped debtor.

16

Indeed, Plaintiffs complain that Vanguard paid the Pegasus Parties and not Plaintiffs: "During 2001, while Vanguard failed to make lease payments to the plaintiffs, it paid approximately, $5.44 million on lease payments to the Pegasus defendants." (R. 91-1, FAC ¶ 21.)

In such circumstances, "conflicting contractual rights stand on an equal plane." *Miyano Mach. USA, Inc. v. Zonar*, No. 92 C 2385, 1994 WL 233649, at *5 (N.D. Ill. May 23, 1994). "Generally, when A has a valid contract with C, and C enters into a contract with B, and the enforcement of A's contract depends on the non-enforcement of B's contract, A is privileged to use any reasonable means to bring about a breach of B's contract with C to protect [its] own interest." *Connaughton*, 94 Ill. App. 3d at 270, 418 N.E.2d at 862; *see also International Admin. Inc. v. Life Ins. Co. of N. Am.*, 541 F. Supp. 1080, 1082 (N.D. Ill. 1982); *Langer v. Becker*, 176 Ill. App. 3d 745, 750, 531 N.E.2d 830, 833 (Ill. App. Ct. 1988). The Pegasus Parties and Plaintiffs were competing creditors,[11] and the Pegasus Parties' contracts with Vanguard were on at least equal footing with Plaintiffs' contracts with Vanguard.[12] *Miyano Mach.*, 1994 WL 233649, at *5. The Pegasus Parties therefore were privileged to engage in the conduct of which Plaintiffs complain. *Id.*

> **b.      Plaintiffs Fail To Establish That The Pegasus Parties' Conduct Was Unjustified**

Where, as here, a conditional privilege exists, "the plaintiff, to succeed on a claim of

---

[11] The Pegasus Parties had contractual rights to payment from Vanguard "literally dwarfing" those of Plaintiffs. *Miyano Mach.*, 1994 WL 233649, at *5. At the time Vanguard filed for bankruptcy, it owed Plaintiffs approximately $6.5 million and the Pegasus Parties over $61 million.

[12] Plaintiffs provide no facts to support an inference that their contractual rights are somehow superior to those of the Pegasus Parties' rights, for instance, by virtue of a subordination agreement.

17

tortious interference with contract, must allege and prove that the agent's intentional acts were not taken to further its principal's best interests, but to further its personal goals or to injure the other party to the contract." *Waldinger Corp. v. CRS Group Eng'rs, Inc.*, 775 F.2d 781, 790 (7th Cir. 1985). To establish the third factor of a tortious interference claim, "[i]t is not necessary to prove that defendant acted with ill will, hostility or an intent to injure." *Amalgamated Fin. Corp. v. Atlantis, Inc.*, 105 Ill. App. 3d 379, 381, 434 N.E.2d 417, 419 (Ill. App. Ct. 1982). "Rather, plaintiff must demonstrate that the 'defendant acted intentionally and without just cause.'" *In re Cutty's-Gurnee, Inc.*, No. 91 C 6179, 1991 WL 277595, at *9 (N.D. Ill. Dec. 19, 1991) (citing *Amalgamated*, 105 Ill. App. 3d at 381, 434 N.E.2d at 419). Plaintiffs bear the burden of establishing that the Pegasus Parties' actions were "unjustified" in the sense that they were either for purposes other than those giving rise to the privilege or that they were otherwise independently unlawful. *HPI Health Care Servs.*, 131 Ill. 2d at 158, 545 N.E.2d at 677-78; *Miyano Mach.*, 1994 WL 233649, at *5. Plaintiffs fail to do so.

Assuming all factual inferences in favor of Plaintiffs, the Pegasus Parties demanded that Vanguard require Plaintiffs to agree to lease deferrals as a condition precedent to the Pegasus Parties' financing of Vanguard,[13] and encouraged Vanguard to terminate the Leases early.[14] Pegasus asked for and obtained some lease payments that Vanguard owed to Pegasus pursuant to the Lease Deal. The Pegasus Parties received cash flow reports from Vanguard and were

---

[13] It is disputed whether the Pegasus Parties made this a condition precedent of the financing or whether it was Vanguard's idea.

[14] Vanguard and Seabury, not the Pegasus Parties, first suggested the early lease terminations. The Business Plan that Vanguard and Seabury presented to the Pegasus Parties in September 2000 contemplated that Vanguard would terminate certain Boeing 737 leases early.

18

involved in the hiring of various Vanguard personnel. Although these facts may support an inference that the Pegasus Parties closely monitored Vanguard's cash-flow status and fleet-planning operations, and were involved in various hiring decisions, they are insufficient for Plaintiffs to prevail on a tortious interference with contract claim. Rather, these activities are the privileged activities of a fellow lessor/creditor.

Each of these facts involves actions taken in furtherance of the Pegasus Parties' interest as a very large creditor of Vanguard. *Miyano Mach.*, 1994 WL 233649, at *5. As previously discussed, Pegasus's rights and interests as a lessor and creditor of Vanguard are of "equal or greater value" than those of Plaintiffs. *HPI Health Care Servs.*, 131 Ill. 2d at 157, 545 N.E.2d at 677. Plaintiffs fail to establish facts from which a jury could conclude that the Pegasus Parties' purpose fell outside its privilege as a competing creditor seeking to monitor its investment.[15] *See Miyano Mach.*, 1994 WL 233649, at *5 (creditor's demand that the debtor pay it rather than competing creditor was privileged).

Neither have Plaintiffs established facts from which a reasonable jury could conclude that the Pegasus Parties' actions were otherwise illegal. *Miyano Mach.*, 1994 WL 233649, at *5; *see also Venturini v. Affatato*, 84 Ill. App. 3d 547, 554-55, 405 N.E.2d 1093, 1098-99 (Ill. App. Ct.

---

[15] Plaintiffs argue that Vanguard showed "extreme deference" to the Pegasus Parties' views, but do not establish how such deference supports their tortious interference claim. Vanguard's CFO Rescino was the sole decision-maker regarding the prioritization of payments of lease and other debt obligations. (R. 161-1, Pegasus's Rule 56.1 Reply, ¶ 115.) At all relevant times, Vanguard's officers and directors remained the sole decision makers on every aspect of Vanguard's business. (*Id.* ¶¶ 58, 116-117.) Vanguard's officers sought the Pegasus Parties' assistance and input based on their airline and aircraft expertise and industry contacts. Based on the facts before the Court, any deference by Vanguard to the Pegasus Parties' views was voluntary.

1980) (action not privileged because it also constituted conspiracy to defraud).

Plaintiffs fail to provide any facts that prove or even support an inference that the Pegasus Parties' actions were unjustified. Plaintiffs' conclusory statement that "their interference was unjustified" is insufficient to defeat summary judgment. Because Plaintiffs cannot establish that the Pegasus Parties' conduct was unjustified—the third element of their tortious interference with contract claim—the Court grants summary judgment in favor of the Pegasus Parties as to Count VI of the FAC. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).

### 3. Plaintiffs Cannot Establish That The Pegasus Parties Caused or Induced Vanguard To Breach Any Contracts

Plaintiffs also fail to establish the fourth element, that the Pegasus Parties caused Vanguard's breaches. This is a second, independent reason compelling summary judgment in favor of the Pegasus Parties.

As already noted, Plaintiffs do not specify in their summary judgment papers which of Vanguard's breaches the Pegasus Parties allegedly caused or induced. In the FAC, Plaintiffs allege that Vanguard breached the Leases and Promissory Notes by failing to pay certain amounts, and that Vanguard breached the Agreements in Principle by failing to satisfy certain preconditions to early lease termination (including failing to pay certain amounts and failing to give adequate notice). Plaintiffs, however, do not allege that the Pegasus Parties caused or induced these particular breaches. The Pegasus Parties argue that at most, Plaintiffs identify facts that support an inference that the Pegasus Parties induced Vanguard to require Plaintiffs to enter into the lease deferral and early termination agreements, and that Vanguard made payments to the

20

Pegasus Parties pursuant to the Lease Deal. The Pegasus Parties point out that the fact that Vanguard and Plaintiffs entered into the Agreements in Principle and the fact that Vanguard paid the Pegasus Parties pursuant to the Lease Deal do not constitute breaches. The Court agrees.

Plaintiffs unsuccessfully argue that there are two significant factual disputes regarding causation: (1) whether Pegasus made the lease deferrals a condition of its funding; and (2) whether the Pegasus Parties caused Plaintiffs to forbear enforcement against Vanguard.[16] (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J., at 8.) First, even if Pegasus made the lease deferrals a condition of its funding, this does not support a tortious interference claim. The fact that Plaintiffs and Vanguard entered into lease deferral arrangements does not constitute a breach of any contract between Plaintiffs and Vanguard.

Second, even if the Pegasus Parties caused Plaintiffs to forbear enforcement against Vanguard, it is unclear how such facts support Plaintiffs' tortious interference claim. To prevail, Plaintiffs must prove that the Pegasus Parties caused or induced *Vanguard* to breach its contractual obligations to Plaintiffs. Here, Plaintiffs appear to argue that the Pegasus Parties influenced *Plaintiffs'* behavior. Even if Plaintiffs provided undisputed facts supporting such an allegation—which they do not—such facts would not support a finding that the Pegasus Parties caused or induced *Vanguard* to breach its contracts with Plaitniffs.

Plaintiffs cannot shift responsibility to the Pegasus Parties for the contractual liabilities that Vanguard owed to Plaintiffs. Plaintiffs cannot prevail as a matter of law on their tortious

---

[16] Plaintiffs confusingly argue that "Pegasus leased and delivered one B737 for cover and negotiated to obtain two more. A reasonable jury could decide that the conduct of the Pegasus defendants interfered with plaintiffs' contracts and consequently, that plaintiffs were injured." (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J., at 8.)

interference claim because they fail to establish that the Pegasus Parties' conduct was unjustified and because they fail to establish that the Pegasus Parties' conduct caused or induced Vanguard's breaches. Accordingly, summary judgment is granted in favor of the Pegasus Parties as to Count VI.

### B.    Count VII: Unjust Enrichment

To succeed on an unjust enrichment claim, a plaintiff must prove that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs.*, 131 Ill. 2d at 160, 545 N.E.2d at 679. Where, as here, the plaintiff seeks recovery of a benefit that was transferred to the defendant by a third party, "retention of the benefit would be unjust where (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.*, 131 Ill. 2d at 161, 545 N.E.2d at 679-80 (citations omitted). "The cause of action based on unjust enrichment however does not require fault or illegality on the part of the defendant; rather, the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment." *Fireman's Annuity & Ben. Fund v. Municipal Employees' Officers' & Officials' Annuity & Ben. Fund,* 219 Ill. App. 3d 707, 712, 579 N.E.2d 1003, 1007 (Ill. App. Ct. 1991); *First Savs. Bank of Hegewisch v. Orchowski*, No. 91 C 7083, 1994 WL 148668, at *8 (N.D. Ill. Apr. 21, 1994).

Plaintiffs' summary judgment motion fails to identify specific facts that create a genuine

issue as to whether the Pegasus Parties were unjustly enriched. Plaintiffs appear to base their unjust enrichment claim on the second and third prongs, arguing that the Pegasus Parties procured a benefit[17] from Vanguard through wrongful conduct, and that Plaintiffs have a better claim to the benefit.[18]

### 1.     Wrongful Conduct

In support of their unjust enrichment claim, Plaintiffs rely on the same set of facts that they asserted in support of their tortious interference claim. For example, they rely on the Pegasus Parties' asking Vanguard to make payments to Pegasus pursuant to the Lease Deal, and the Pegasus Parties receiving monthly cash flow reports from Vanguard. Plaintiffs generally argue that these facts support an inference that the Pegasus Parties engaged in wrongful conduct that renders the retention of the benefit unjust. These facts, however, are insufficient to support a finding of wrongful conduct because the Pegasus Parties were privileged to engage in the conduct at issue, and their activities were not unjustified or otherwise illegal and hence not "wrongful."

### 2.     Better Claim

Plaintiffs appear to further argue that the Pegasus Parties' retention of the Vanguard payments was unjust because Plaintiffs had a better claim to the benefit. But Plaintiffs identify no facts to support an inference that their contractual claims with Vanguard were superior to the Pegasus Parties' claims. Indeed, Plaintiffs do not even argue that their contractual claims are

---

[17] The "benefit" appears to be payments that the Pegasus Parties received from Vanguard.

[18] Plaintiffs do not argue under the first prong that Vanguard should have given the benefit to Plaintiffs, but mistakenly gave it to the Pegasus Parties instead.

superior or that the Pegasus Parties' claims are subordinated. As already noted, in most cases, "conflicting contractual rights stand on an equal plane," *Miyano Mach.*, 1994 WL 233649, at *5, and in this case, there are simply no facts establishing that Plaintiffs enjoyed a preferred status over other creditors such as the Pegasus Parties. Because the Pegasus Parties' contracts with Vanguard are on an equal plane with Plaintiffs' contracts with Vanguard, Plaintiffs cannot prevail on their unjust enrichment claim on the theory that they had a better claim to the benefit. *See HPI Health Care Servs.*, 131 Ill. 2d at 163-64, 545 N.E.2d at 680. Accordingly, summary judgment is granted in favor of the Pegasus Parties as to Count VII of the FAC.

## II.    Seabury's Motion for Summary Judgment

Seabury has moved for summary judgment as to Counts IV, V, and VIII of the FAC.

### A.    Plaintiffs Cannot Prevail On Either Their Fraud Claim (Count IV) Or Their Negligent Misrepresentation Claim (Count V)

Plaintiffs argue that Seabury and Vanguard defrauded them into entering into the lease deferral agreements by misrepresenting the nature and status of Vanguard's deals with Pegasus, Seabury, and IAC. Plaintiffs base their fraud and negligent misrepresentation claims on the same set of facts. *See* R. 146-1, Pls.' Mem. in Opp. to Seabury's Mot. for Summ. J., at 9 ("These same facts and circumstances also would permit a reasonable jury to find for plaintiffs that Seabury negligently made one or more misrepresentations.").

To prevail on a fraud claim, a plaintiff must establish:  (1) a false statement of material fact; (2) defendant's knowledge or belief that the statement was false; (3) defendant's intent to induce plaintiff to act; (4) plaintiff's reasonable reliance on the truth of the statement; and (5) plaintiff's damages resulting from that reliance. *TRW Title Ins. Co. v. Security Union Title Ins.*

24

*Co.*, 153 F.3d 822, 828 (7th Cir. 1998); *Orix Credit Alliance v. Taylor Mach. Works,* 125 F.3d

468, 479 n.5 (7th Cir. 1997). The plaintiff's justifiable reliance on the alleged fraudulent

statements is an essential element of a fraud claim. *Teamsters Local 282 Pension Trust Fund v.*

*Angelos,* 839 F.2d 366, 370 (7th Cir. 1988); *Neuma, Inc. v. AMP, Inc.*, No 98 C 6616, 2002 WL

264898, at *3 (N.D. Ill. Feb. 22, 2001). To prevail on a fraud claim that is based on the

defendant's failure to disclose a material fact, a plaintiff must prove that the defendant concealed

a material fact when he was under a duty to disclose that fact to plaintiff. *Connick v. Suzuki*

*Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584, 594 (Ill. 1996).

The elements of claims for fraud and negligent misrepresentation are essentially the same.

*Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 335 (7th Cir. 1999). The only difference is the intent

requirement—to prevail on a claim for negligent misrepresentation, the plaintiff need only prove

the defendant's carelessness with respect to ascertaining the truth of the statement. Accordingly,

to prevail on their negligent misrepresentation claim, Plaintiffs must establish: (1) a false

statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement

by the party making it; (3) an intention to induce the plaintiff to act; (4) action by the plaintiff in

reasonable reliance on the truth of the statement; and (5) damage suffered by the plaintiff as a

result of its reasonable reliance. *Lemont Partners, LLC v. Meijer Stores Ltd. P'ship,* No. 02 C

1799, 2002 WL 31641623, at *12 (N.D. Ill. Nov. 26, 2002) (citing *Neptuno Treuhand-Und*

*Verwaltungsgesellschaft Mbh v. Arbor,* 295 Ill. App. 3d 567, 574, 692 N.E.2d 812, 818 (Ill. App.

Ct. 1998)). Additionally, a plaintiff must also establish a duty on the part of the defendant to

communicate accurate information, such as where the defendant is "in the business of supplying

information for the guidance of others in their business dealings." *Tolan & Son, Inc. v. KLLM*

25

*Architects, Inc.,* 308 Ill. App. 3d 18, 27, 719 N.E.2d 288, 296 (Ill. 1999). As with fraud, the plaintiff's reliance upon the defendant's negligent misrepresentation must be reasonable. *In re Rovell,* 194 F.3d 867, 870 (7th Cir. 1999) (citing *Board of Educ. v. A, C & S, Inc.,* 131 Ill. 2d 428, 451, 546 N.E.2d 580, 591 (1989)).

### 1.     Seabury's Representations

Plaintiffs argue that a reasonable jury could find for Plaintiffs on their fraud and negligent misrepresentation claims based on the Seabury representations discussed below. The Court views each of these alleged misrepresentations in the light most favorable to Plaintiffs.

### a.     The Nature Of Pegasus's $7 Million Investment

Plaintiffs based several alleged misrepresentations on the nature of Pegasus's $7 million investment. Seabury and Vanguard failed to disclose to Plaintiffs that only $3.25 million of the $7 million in financing committed by Pegasus and its affiliates would be in the form of cash or equity, while the balance of the commitment was a loan. Seabury did not disclose that of the $7 million "commitment," $3 million was actually a secured debt and $1 million was a loan that was not guaranteed. Seabury represented that Vanguard would get $7 million, when Vanguard would receive only about $5.5 million with Pegasus or Pegasus affiliates retaining the remaining amount.

### b.  Financial Forecasts

Seabury represented that the infusion of $7 million from Pegasus was sufficient to keep Vanguard's obligations current, whereas in fact Vanguard actually required millions of dollars in additional capital to stay current. Seabury represented that Vanguard's revenue forecasts were conservative and reasonable when Vanguard's recent operating losses rendered them overly optimistic. Seabury failed to disclose that Vanguard's revenue forecasts were obsolete based on Vanguard's recent operating losses. Seabury was aware that Vanguard's financial situation had continued to deteriorate, yet Seabury failed to correct any of the erroneous or materially misleading representations that it made to Plaintiffs through the financial forecasts.

### c.  Seabury's Threat Of Vanguard's Bankruptcy

Seabury represented that Vanguard would file for Chapter 11 bankruptcy unless Plaintiffs agreed to defer their lease rights, even though Vanguard did not seriously consider filing for bankruptcy until February 2001. Wiley told Plaintiffs that Pegasus would provide debtor-in-possession financing to Vanguard, but later testified that Pegasus never considered providing debtor-in-possession financing: "It was our opinion that a bankruptcy would be very difficult for Vangaurd."

### d.  The KH Group's Approval Of The Kansas City Hub Strategy

Seabury represented that the KH Group, a route planning specialist, endorsed the Kansas City hub strategy, when in fact, the KH Group did not endorse the strategy. The KH Group did not support the Kansas City Hub Strategy due to the relatively small size of the Kansas City market and the presence of a Vanguard competitor, Southwest Airlines, in the same market.

Seabury gave the impression that Vanguard's implementation of the Kansas City hub strategy was imminent when in fact it was being delayed.

### e. Seabury's Representation That Vanguard Did Not Intend To Terminate Plaintiffs' Leases Early

Seabury and Vanguard represented that Vanguard's proposed deferral of rents under the Leases was not intended to affect Plaintiffs' right to full payment. Seabury and Vanguard disclosed that the plan was to acquire the use of MD-80s, but they did not specifically disclose that this plan meant that the MD-80s would replace Plaintiffs' 737s and that Vanguard would terminate Plaintiffs' Leases early. Vanguard subsequently proposed to terminate the Leases with Plaintiffs involving their 912MP and 5WM planes.

### 2. Plaintiffs Fail to Establish Facts Sufficient To Support A Fraud Or Negligent Misrepresentation Claim

### a. The Nature Of Pegasus's $7 Million Investment

First, Seabury's statements were not false. The Pegasus Parties committed "$7 million in capital," of which part was cash and part was debt.

Second, the allegedly omitted and misrepresented information regarding the nature and amount of the Pegasus Parties' investment is specifically included in the presentation materials that Plaintiffs acknowledge receiving at the Chicago Meeting. A bullet point in the Strategy Update states that Vanguard reached a deal for "$7 million *in capital*" (emphasis added). Plaintiffs claim that they assumed that the term "capital" referred to equity financing only, and acknowledge that they did so without any indication to that effect from Seabury or Vanguard, and without seeking any clarification or verification. Plaintiffs' representatives acknowledge

28

understanding that, in standard business usage, the term "capital" encompasses both equity and debt, and that businesses are often financed through a combination of equity and debt.

Plaintiffs could have easily discovered the fact that the $7 million comprised both equity and debt by simply reading the rest of the presentation materials. Plaintiffs do not dispute that another section of the presentation materials discloses that the $7 million commitment comprises both equity and debt. An element of a fraudulent concealment claim is that "the innocent party could not have discovered the truth through a reasonable inquiry or inspection or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist." *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1367 (N.D. Ill.1996) (citation omitted).

Plaintiffs' reliance on the single bullet point of the text is not reasonable as a matter of law because Plaintiffs had access to the omitted information. "The law will not allow a person to enter into a transaction with eyes closed to material facts and then claim fraud by deceit." *Go For It, Inc. v. Aircraft Sales Corp.*, No. 02 C 6158, 2003 WL 21504600, at *3 (N.D. Ill. June 27, 2003.)

### b.    Financial Forecasts

As a general rule in Illinois, predictions about the future are opinions and are not actionable under a fraud theory. *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1299 (7th Cir. 1993). Projections of future economic performance, like forward looking statements and opinions, do not constitute actionable misrepresentations of material fact under Illinois law. *Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 n.1 (7th Cir. 1985) (predictions or opinions regarding future business performance cannot serve as the basis for a fraud claim). Further, the

29

Strategy Update contained a prominent, clear disclaimer cautioning users "not to place undue reliance on forward looking statements, which may be based on assumptions and anticipated events that do not materialize." The presence of the prominent disclaimer further underscores that Plaintiffs' reliance was not reasonable. *See VMS Ltd. P'ship Secs. Litig.*, 803 F. Supp. 179, 192-93 (N.D. Ill. 1992).

To the extent that Plaintiffs claim that Vanguard's recent losses rendered the presentation materials obsolete and that Seabury should have disclosed that Vanguard's financial troubles impacted the Business Plan's financial projections, those claims fail because Plaintiffs had access to Vanguard's financial information. At all relevant times, Vanguard was a publicly traded company whose financial information was readily available. Vanguard supplied Plaintiffs' representatives with Vanguard's Form 10-K and 10-Q SEC filings, and Carroll obtained Vanguard's financial information from the internet. IAMM and Coleman Aviation Investors, Inc. obtained Vanguard's financial information and reviewed that information on behalf of Plaintiffs. Plaintiffs knew that Vanguard lost money throughout the entire time of their leasing relationship. Plaintiffs do not provide any facts showing that Seabury prevented Plaintiffs from accessing Vanguard's financial information, or that Seabury had a unique ability to assess Vanguard's financial condition. "[O]ne is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *HPI Health Care Servs.*, 131 Ill. 2d at 170, 545 N.E.2d at 683.

### c. Seabury's Threat Of Vanguard's Bankruptcy

Plaintiffs fail to create an issue of fact. First, to support their assertion that "Vanguard did not seriously consider bankruptcy until late February 2001," Plaintiffs improperly cite directly to the record rather than to a Rule 56.1 statement of fact. This is improper under the Local Rules. *Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D. Ill. 2000); *Buxton v. Equifax Credit Info. Servs., Inc.*, No. 02 C 6288, 2003 WL 22844245, at *1 (N.D. Ill. Dec. 1, 2003). In any event, the record evidence to which Plaintiffs cite shows that Vanguard did in fact consider bankruptcy before February 2001.

### d. The KH Group's Approval Of The Kansas City Hub Strategy

Seabury does not adequately dispute Plaintiffs' contention that the KH Group did not endorse the Kansas City hub strategy. Thus, a reasonable jury could conclude that Seabury's representation regarding the KH Group's endorsement was false. Plaintiffs fail to provide sufficient facts, however, from which a jury could infer that Plaintiffs reasonably relied on that misrepresentation to their detriment. In fact, Plaintiffs fail to proffer any facts showing that they specifically relied on this representation.

### e. Seabury's Representation That Vanguard Did Not Intend To Terminate Plaintiffs' Leases Early

Plaintiffs' cannot establish that their reliance on this representation was reasonable. The Strategy Update clearly sets forth Vanguard's strategy of implementing the MD-80 aircraft and phasing out the 737s. The Strategy Update specifically states that "Over the next three years, the Company [Vanguard] will accept delivery of ten 132-seat MD-82/-83 aircraft and ten 112-seat MD-87 aircraft . . . . The Company expects to have retired all of its B737-200 aircraft by the end

31

of 2004." Several 737 leases, including a subset of Plaintiffs' leases, extended beyond that time. Plaintiffs' reliance on this representation therefore is not reasonable. *Go For It*, 2003 WL 21504600, at *3. Accordingly, summary judgment is granted as to Counts IV and V of the FAC as to Seabury.

### B. The Pegasus Parties' and Seabury's Motions for Summary Judgment As To Count VIII: Fraudulent Scheme

In Count VIII, Plaintiffs allege that the Pegasus Parties, Seabury, and Vanguard engaged in a fraudulent scheme, "the object of which was to prematurely terminate plaintiffs' leases and establish Pegasus as [Vanguard's] sole aircraft provider." (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J., at 8.) Specifically, Plaintiffs allege that the Pegasus Parties, Seabury, and Vanguard acted in concert after the Chicago Meeting to obtain Plaintiffs' Agreements in Principle. The Pegasus Parties and Seabury both moved for summary judgment on Count VIII.

Illinois "does not provide a remedy for fraudulent promises (promissory fraud) unless they are part of a scheme to defraud." *Desnick v. American Broad. Cos.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (citations omitted). To prove a scheme to defraud, Plaintiffs must establish a pre-existing intent to defraud. *Speakers of Sport, Inc. v. Proserve, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). Plaintiffs must also prove "an elaborate artifice of fraud." *Desnick*, 44 F.3d at 1355.

Promissory fraud "is a disfavored cause of action in Illinois." *Razdan v. General Motors Corp.*, 979 F. Supp. 755, 759 (N.D. Ill. 1997). Because promissory fraud is easy to allege and difficult to prove or disprove, "the burden on a plaintiff claiming promissory fraud is deliberately high." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). "If the rule were otherwise, anyone

with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid." *Id.* (citations omitted.)

### 1. Facts Showing Seabury's And The Pegasus Parties' Roles In The Alleged Scheme

Plaintiffs argue that the object of the scheme was "to prematurely terminate plaintiffs' leases and establish Pegasus as its sole aircraft provider." (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J., at 8.) Plaintiffs contend that the following facts demonstrate a "larger pattern of deceptions or enticements that reasonably induces reliance," as required by *Desnick*, 44 F.3d at 1354. (R. 146-1, Pls.' Mem. in Opp. to Seabury's Mot. for Summ. J., at 12.) At the Chicago Meeting, Seabury represented to Plaintiffs that Vanguard did not intend to terminate Plaintiffs' Leases early or to replace their planes with Pegasus's planes. Also at the Chicago Meeting, Seabury represented that the Vanguard financial forecasts contained in the Strategy Update and Coleman Lease Deferral Request were conservative and reliable, and did not disclose to Plaintiffs that the financial forecasts did not reflect Vanguard's recent losses. After the Chicago Meeting, Seabury did not inform Plaintiffs that Vanguard's financial condition continued to deteriorate. During the February 14, 2001 conference call, Seabury, through Mahr, and Pegasus, through Wiley, threatened Coleman that Vanguard would file for bankruptcy unless Plaintiffs agreed to the lease deferrals. During the same conference call, Wiley represented that Pegasus was interested in leasing planes to Vanguard and that VAC was "serious" about making an equity investment in Vanguard. Together, Mahr and Wiley conferred with Vanguard's officers over the next several days to determine a strategy to obtain lease concessions from

33

Plaintiffs and other lessors. Plaintiffs further point out that Vanguard defaulted within one week after signing the last of the Promissory Notes. In July 2001, when the payments to Plaintiffs were scheduled to resume, Vanguard defaulted and continued to default on its various promises until June 24, 2002, when Vanguard tendered the remaining two aircraft in "as is/where is" condition. Plaintiffs argue that a reasonable jury could infer, based on this "cascade of unfulfilled promises," that "Plaintiffs had been identified as inimical to Pegasus's interests in Vanguard." (R. 147-1, Pls.' Mem. in Opp. to Pegasus's Mot. for Summ. J., at 9.)

### 2. These Facts Are Insufficient For Plaintiffs To Prevail On Their Fraudulent Scheme Claim

Plaintiffs provide no facts from which a reasonable jury could find a fraudulent scheme. Plaintiffs could not reasonably rely on Seabury's representation that Vanguard did not intend to terminate Plaintiffs' Leases early because the presentation materials contemplated the early termination of certain 737 leases. The financial forecasts are not part of a pattern to defraud because projections of future economic performance do not constitute actionable misrepresentations, especially where a disclaimer accompanies the forecast. Moreover, as previously noted, Plaintiffs had access to Vanguard's financial information. The representation that Vanguard would file for bankruptcy unless Plaintiffs agreed to the Lease Deferrals was not false. Similarly, Wiley's representation that Pegasus was interested in leasing planes to Vanguard and that VAC was "serious" about making an equity investment in Vanguard was not false. At that time, Pegasus was not only interested in leasing MD-80 aircraft to Vangaurd, it was already committed to doing so, had entered into the first leases, and began delivering aircraft in March. Similarly, VAC was serious about making an equity investment in Vanguard, and in

fact made a $3.25 million equity investment in Vanguard on March 9, 2001. There simply was no fraudulent act by the Pegasus Parties or Seabury in furtherance of a scheme.[19]

## III. Counterdefendants' Motion For Judgment On The Pleadings (Count III Of The Counterclaim)

### A. Legal Standard Under Rule 12(c)

On a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), a court ordinarily applies the same standard that applies to a Rule 12(b)(6) motion to dismiss. *N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citing *Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir. 1996)). Thus, a court must grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989).

Where the parties rely on documents beyond the pleadings, however, a court must convert the Rule 12(c) motion into a motion for summary judgment. Fed. R. Civ. P. 12(c); *Massey v. Helman*, 259 F.3d 641, 646 (7th Cir. 2001); *Dempsey v. Atchison, Topeka, and Santa Fe Ry.*, 16 F.3d 832, 835-36 (7th Cir. 1994). A court may not grant such a converted motion for summary judgment without giving the adversely affected party sufficient notice and an opportunity to respond to the summary judgment motion. *Alioto v. Marshall Field's & Co.*, 77 F.3d 934, 936 (7th Cir. 1996). In this case, Pegasus and VAC requested that the Court consider documents beyond the pleadings and convert the motion into a motion for summary judgment. Specifically, Pegasus and VAC urged the Court to consider the statements of fact submitted with the

---

[19] It is undisputed that *Vanguard* broke a series of promises to Plaintiffs by failing to make payments on the Leases and the Promissory Notes. The question of whether Plaintiffs may prevail on their fraudulent scheme claim against Vanguard, however, is not before the Court.

contemporaneous motion for partial summary judgment as to Counts I, II, and IV of the Counterclaim because the motion for partial summary judgment and the motion for judgment on the pleadings are based on the same set of operative facts. Thus, Pegasus and VAC, the "adversely affected parties," had sufficient notice and an opportunity to respond to the motion because they, rather than Plaintiffs, requested that the Court convert the motion into a motion for summary judgment.

### B. Pegasus and VAC's Negligent Misrepresentation Claim Fails Because There Are No Facts Establishing A Duty To Convey Accurate Information

In support of their claim for negligent misrepresentation, Pegasus and VAC argue that Counterdefendants told Pegasus and VAC that they (1) believed that Vanguard's Business Plan was feasible (when in fact Coleman later admitted that he did not believe in it); and (2) would cooperate in the Lease Deferrals sought by Vanguard on an "equal footing" with Vanguard's other 737 lessors, as part of the Business Plan (when at the time of the representation Counterdefendants allegedly already knew that they would not be willing or able to do so). Counterdefendants argue that this claim fails because Pegasus and VAC improperly seek to recover damages based solely on economic losses, and because they fail to establish a genuine issue of material fact as to whether Counterdefendants had a duty to provide accurate information.

Illinois law generally prohibits a plaintiff from recovering in tort for purely economic losses, although the prohibition is not absolute. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 88, 435 N.E.2d 443, 451 (Ill. 1982); *Gerdes v. John Hancock Mut. Life Ins. Co.*, 712 F. Supp. 692, 696 (N.D. Ill. 1989) (citations omitted). One such exception is the "commercial information

provider" exception. Courts narrowly construe this exception. *Gerdes*, 712 F. Supp. at 697. To qualify for this exception, the plaintiff must establish that the defendant 1) is in the business of supplying information, and 2) provides this information for the guidance of others in its business relations with third parties. *Id.* at 696. A party is not in the business of "supplying information" if the information is merely ancillary to the services rendered or products sold. *Lemont Ptrs. v. Meijer Stores Ltd. P'ship*, No. 02 C 1799, 2002 WL 31641623, at *13 (N.D. Ill. Nov. 22, 2002).

### 1.    Pegasus and VAC Seek Purely Economic Losses

In this case, Pegasus claims damages based on "the rental payments to which it is entitled under each of the seven leases that it entered into with Vanguard pursuant to the Lease Transaction," including "unpaid back rent." (R. 71-1, Corrected Countercl. ¶¶ 32-33.) VAC seeks damages based on its actual investment of $7.5 million, claiming that it is "unable to realize a return on its investment . . . under the Capital Transaction." (R. 68-1, Compl. In Intervention ¶ 31.) Pegasus and VAC contend that these are "out-of-pocket" losses, to which the economic loss doctrine does not apply. Pegasus and VAC are correct that "economic loss" is not a synonym for "monetary loss." The damages that Pegasus and VAC seek, however, are the result of disappointed commercial expectations. To recover in tort under the economic loss doctrine, a party must show harm above and beyond a party's contractual or commercial expectations. *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 201, 680 N.E.2d 265, 276 (Ill. 1997); *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003). "[C]ommercial disputes ought to be resolved according to the principles of commercial law rather than according to tort principles designed for accidents that cause personal injury or property damage." *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 575 (7th Cir. 1990).

37

Pegasus and VAC further argue that the economic loss doctrine does not apply because there is no privity of contract between the parties. They contend that "at the root of the economic loss doctrine is the assumption that, whether or not the plaintiff can assert a valid contract claim, there *was* in fact a contract between the party whose expectations were disappointed and the party who allegedly caused the disappointment." (R. 139-1, Counterpls.' Mem. in Opp. to J. on the Pldgs., at 4.) The Seventh Circuit disagrees. "Privity of contract is not an element of the economic loss doctrine." *Miller*, 902 F.2d at 575.

### 2. Pegasus And VAC Provide No Facts Establishing That Counterdefendants Had A Duty To Provide Accurate Information

To prevail on their negligent misrepresentation claim, Pegasus and VAC must provide facts showing that Counterdefendants had a duty to provide accurate information to Pegasus and VAC. Pegasus and VAC argue that the test for whether such a duty arises focuses on whether the defendant "in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions." (R. 139-1, Counterpls.' Mem. in Opp. to J. on the Pldgs., at 7) (citing Restatement (2d) of Torts, § 552(1) (1977).) The duty requirement under Illinois law, however, is more restrictive than the Restatement definition. In *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362 n.8 (7th Cir. 1989), the Seventh Circuit noted that *Moorman* "quite clearly limits recovery to (1) intentional (fraudulent) misrepresentation and (2) negligent misrepresentation where the 'business of supplying information' test is met," and cautioned against applying pre-*Moorman* caselaw because Illinois law is more narrow than the Restatement. The Court concluded that "the two critical defining features of the economic loss

38

doctrine are 'First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions.'" *Rankow*, 870 F.2d at 362 (citation omitted).

Pegasus and VAC fail to support an inference that Counterdefendants are in the business of supplying information. It is undisputed that Counterdefendants are in the business of leasing aircraft, a tangible product. "The test for whether a party is in the business of offering information for the guidance of others in their business transactions is whether or not the 'end product' of the relationship between the party and its clients is a 'tangible thing.' If the end product is tangible then the party's business does not fit within the exception to the economic loss doctrine." *Trans Helicopter Serv. v. Jet Support Servs., Inc.*, No 03 C 0498, 2004 WL 725700, at *5 (N.D. Ill. Mar. 30, 2004) (citing *Tolan and Son,* 719 N.E.2d at 296). Pegasus and VAC have not provided any facts to fall within this exception. Accordingly, summary judgment is granted in favor of Counterdefendants as to Count III of the Counterclaim.

## IV.     Counterdefendants' Motion For Partial Summary Judgment On Counts I, II, and IV Of The Counterclaim

Pegasus and VAC argue that Counterdefendants induced Pegasus to lease planes to Vanguard and induced VAC to invest approximately $3.25 million in the purchase of Vanguard stock. Pegasus and VAC base their intentional fraud (Counts I and II) and fraudulent scheme (Count III) claims on the same set of facts. The Court has previously set forth the elements that Plaintiffs must establish in order to prevail on their claims of fraud and fraudulent scheme, and does not repeat them here. *See* Sections II.A and II.B.

## A. Counts I and II: Intentional Fraud

Counts I and II are virtually indistinguishable, and Pegasus and VAC make no effort to distinguish them either in their brief or in the Counterclaim. The Court therefore addresses the specific representations that form the basis of the fraud claims without further differentiating between Counts I and II.

### 1. Counterdefendants' Representations

Pegasus and VAC argue that a reasonable jury could find in their favor on their fraud claims based on the following representations made by Counterdefendants.

#### a. Coleman's Statement That He Believed In The Business Plan

During the February 14, 2001 conference call between Coleman, Wiley, and Mahr, Coleman expressed his belief that Vanguard had a viable business plan.[20] In January 2001, Coleman expressed some doubt about Vanguard's Business Plan during the Chicago Meeting and again during a subsequent telephone call with Mahr, but he did not share his doubts with Pegasus or VAC. Wiley testified that in July 2001, Coleman told Wiley that he "never believed in the plan in the first place." Counterdefendants never told Pegasus and VAC that they were actually skeptical of the Business Plan.

---

[20] Although Coleman does not specifically remember what he said during the call, Counterdefendants concede for purposes of this motion that "Coleman expressed his belief that Vanguard had a viable business plan." (R. 126-1, Counterdefs.' Mem. in Supp. of Partial Summ. J., at 4.)

### b. Coleman's Promise That Counterdefendants Would Cooperate In The Lease Deferrals On Equal Footing With Other 737 Lessors

During the February 14, 2001 conference call, Coleman promised that Counterdefendants would cooperate in the lease deferrals on an equal basis with Vanguard's other 737 lessors.[21] As promised, Counterdefendants entered into the Agreements in Principle. The Agreements in Principle, however, did not provide for lease deferrals comparable to those reached with Vanguard's other 737 lessors. In fact, the Agreements in Principle had an adverse, rather than a beneficial, effect on Vanguard's cash flow.

### c. Seabury's Representation To Pegasus And VAC That Counterdefendants And Vanguard Entered Into Binding Agreements

Seabury represented to Pegasus and VAC that Counterdefendants entered into binding agreements with Vanguard wherein Counterdefendants agreed to defer Vanguard's leases. In reality, Counterdefendants and Vanguard entered into Agreements in Principle wherein Counterdefendants merely agreed to negotiate in good faith. On the basis of Seabury's representation, VAC closed the Stock Deal and wired Vanguard $3.25 million. The Lease Deferrals formed the basis of VAC's willingness to close the Stock Deal and Pegasus's willingness to go forward with the Lease Deal.

---

[21] The parties dispute whether Coleman promised to cooperate on "equal footing" with other lessors. Counterdefendants admit that Vanguard and Seabury required them to agree initially to equal concessions and later to "substantially equivalent" concessions. For purposes of summary judgment the Court makes all factual inferences in favor of Pegasus and VAC.

### 2. Pegasus And VAC Cannot Prevail On Their Fraud Claims

#### a. Coleman's Statement That He Believed In The Business Plan

Coleman's statement that he believed in the Business Plan is merely an opinion that cannot form the basis of a fraud claim. A fraud action must be predicated upon statements of existing facts, not opinions. "A statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation under Illinois law." *Continental Bank*, 10 F.3d at 1299 (citation omitted). A party who purports to base a prediction upon expertise or special knowledge that, in fact, does not exist, may be liable for fraud. *Shell Oil Co. v. Avar Corp.*, No. 97 C 4479, 1998 WL 312119, at *10 (N.D. Ill. June 5, 1998) ("Statements of opinion may be treated as statements of fact where the speaker holds himself out as having special knowledge.") Although Pegasus and VAC argue that Coleman had such expertise as a long-time creditor and lessor to Vanguard, there is no evidence that Coleman claimed any such expertise or contended that he based his opinion on such expertise.

Pegasus and VAC further appear to argue that Counterdefendants failed to disclose to Pegasus and VAC that they were skeptical of the Business Plan. A party cannot be liable for failure to disclose unless there is a duty to disclose. A duty to disclose arises where the parties are in a fiduciary or confidential relationship, or where "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. This position of superiority may arise by reason of friendship, agency, or experience." *Connick*, 174 Ill. 2d at 500, 675 N.E.2d at 593. Pegasus and VAC argue that Counterdefendants were in a position of influence or superior knowledge by virtue of their status as long-time creditors and

42

lessors to Vanguard. While it is true that Counterdefendants served as creditors to Vanguard for a longer period of time than did Pegasus and VAC, Pegasus and VAC fail to show that Counterdefendants had access to information that other Vanguard creditors did not. There are no facts from which a reasonable jury could infer that Pegasus, a sophisticated aircraft lessor, was in an inferior position compared to Counterdefendants.

                **b.**     **Coleman's Promise That Counterdefendants Would Cooperate In The Lease Deferrals On Equal Footing With Other 737 Lessors**

Coleman's promise that Counterdefendants would cooperate in the Lease Deferral program cannot form the basis of a fraud claim. A fraud action must be predicated upon statements of existing facts, not promises to perform in the future. *HPI Health Care Servs.*, 131 Ill. 2d at 168, 545 N.E.2d at 682; *Continental Bank,* 10 F.3d at 1299. This promise may, however, form the basis of Pegasus and VAC's claim for fraudulent scheme in Count IV.

                **c.**     **Seabury's Representation To Pegasus And VAC That Counterdefendants And Vanguard Entered Into Binding Agreements**

Seabury, not Counterdefendants, made this representation. Pegasus and VAC do not provide any facts to support an inference that Coleman or any other Counterdefendants directed Seabury to make this representation. This representation therefore cannot form the basis of a fraud claim against Counterdefendants. Accordingly, summary judgment is entered in favor of Counterdefendants as to Counts I and II of Pegasus and VAC's Counterclaim.

**B.**     **Count IV: Fraudulent Scheme**

In Count IV of the Counterclaim, Pegasus and VAC argue that Counterdefendants

engaged in a fraudulent scheme to "defraud Pegasus and VAC out of realizing their bargained-for returns from the Lease Transaction and the Capital Transaction, and with the intent of ensuring that each of the Counterdefendants would be able to secure as much of the funds as they could extract from Vanguard before that company became bankrupt." (R. 71-1, Corrected Countercl. ¶ 55.)

As discussed above, promissory fraud is generally not actionable in Illinois, but there is an exception to this rule "where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud." *Steinberg v. Chicago Med. School*, 69 Ill. 2d 320, 333, 371 N.E.2d 634, 641 (Ill. 1977). "This exception is broad, and has even been viewed as swallowing the rule barring promissory fraud actions." *Bower*, 978 F.2d at 1011-12. The scheme exception applies where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Concord Indus., Inc. v. Marvel Indus. Corp.*, 122 Ill. App. 3d 845, 462 N.E.2d 1252, 1255 (Ill. App. Ct. 1984); *see also Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 460 (N.D. Ill. 1989) (Posner, J.) ("[I]f the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable.").

To survive summary judgment on their fraudulent scheme claim, Pegasus and VAC must establish a question of material fact as to whether Counterdefendants had a preexisting intent to defraud and engaged in a pattern of fraudulent acts. *Speakers of Sport*, 178 F.3d at 866 (7th Cir. 1999). Pegasus and VAC provide the following facts in support of their claim of fraudulent scheme. The Court draws all inferences in favor of Pegasus and VAC.

44

Counterdefendants were aware of Vanguard's precarious financial position even before the Chicago Meeting. Counterdefendants knew that Vanguard intended to lease MD-80s and believed that Vanguard "intend[ed] on dumping us."

During the February 14, 2001 conference call, Counterdefendants represented to Wiley that they would cooperate with the Lease Deferrals. Counterdefendants were aware that Vanguard was asking all 737 lessors to cooperate in the Lease Deferrals on a comparable basis. Counterdefendants understood that the conversation was part of Pegasus's and VAC's decisionmaking process regarding whether they would carry out the Lease Deal and Stock Deal, and that Pegasus's and VAC's decisions were based, in part, on Counterdefendants' cooperation with the Lease Deferrals. Coleman, in later describing the call to the other Counterdefendants, noted that "Wiley is clearly now the source of money," and claimed that he had convinced Wiley to "agree[] to come up with extra cash so Vanguard could pay the $500,000 by insisting on a cash payment to accept early return of the N620PC aircraft."

Before entering the Agreements in Principle, Counterdefendants demanded terms from Vanguard that were more onerous to Vanguard than those agreed to by the other 737 lessors. The Agreements in Principle did not provide for lease deferrals comparable to those reached with Vanguard's other 737 lessors. Counterdefendants' agreements and the implementation of those agreements had a negative, rather than beneficial, impact on Vanguard's cash flow.

A reasonable jury might conclude based on these facts that Counterdefendants promised to cooperate in the Lease Deferral program on equal footing with other 737 lessors, that they never intended to negotiate in good faith to restructure the Leases, and that they in fact always

intended to keep Vanguard in a default position in order to extract further funds from it at the expense of Vanguard's other lessors such as Pegasus and VAC. A reasonable jury might find that Counterdefendants had a preexisting intent to defraud and that they engaged in a pattern of fraudulent acts.

Pegasus and VAC could not have reasonably relied, however, on Counterdefendants' promise to cooperate with the lease deferrals on equal footing with other Vanguard lessors after they learned of the terms of the Agreements in Principle that Counterplaintiffs entered into with Vanguard. Pegasus and VAC received the signed Agreements in Principle on March 9, 2001. The Agreements in Principle set forth a two-week window in which the parties were to work diligently to formalize the agreements. A jury may infer that Pegasus and VAC could have reasonably believed that Counterdefendants intended to cooperate during this two-week window. Once the two-week window ended on March 22, 2001, however, it was clear that Counterdefendants no longer intended to cooperate with the lease deferrals. Pegasus and VAC could not have reasonably relied on Counterdefendants' promises after that date. *Teamsters Local 282*, 839 F.2d at 370; *Go For It*, 2003 WL 21504600, at *3. Accordingly, they cannot base their fraudulent scheme claim on any actions that they took after March 22, 2001.

Summary judgment is denied in part as to Count IV of the Counterclaim. Pegasus and VAC may only pursue their fraudulent scheme claim as to actions that they took before March 22, 2001.

## CONCLUSION

Summary judgment is granted in favor of the Pegasus Parties as to Count VI of the FAC (tortious interference with contract) because the Pegasus Parties' conduct was privileged and Plaintiffs fail to establish a genuine issue of material fact as to whether the conduct at issue was unjustified. Summary judgment is granted in favor of the Pegasus Parties as to Count VII of the FAC (unjust enrichment) because Plaintiffs fail to establish a genuine issue as to whether the Pegasus Parties unjustly retained the payments that they received from Vanguard. Summary judgment is granted as to Count IV of the FAC (fraud) and Count V of the FAC (negligent misrepresentation) in favor of Seabury because Plaintiffs fail to provide sufficient facts to support an inference of fraud and negligent misrepresentation. Summary judgment is granted as to Count VIII of the FAC (fraudulent scheme) in favor of the Pegasus Parties and Seabury because Plaintiffs fail to establish any facts from which a jury might conclude that the Pegasus Parties or Seabury engaged in a fraudulent scheme.

Summary judgment is granted as to Counts I and II of the Counterclaim (fraud) in favor of Counterdefendants, because Pegasus and VAC fail to provide facts sufficient to prevail on a claim of fraud. Summary judgment is granted in favor of Counterdefendants as to Count III of the Counterclaim (negligent misrepresentation) because the economic loss doctrine applies and there is no issue of material fact as to whether Counterdefendants are in the business of supplying information. Summary judgment is denied in part as to Count IV of the Counterclaim (fraudulent scheme) because a reasonable jury could find that Counterdefendants engaged in a fraudulent scheme to defraud Pegasus and VAC, but only as to actions that Pegasus and VAC took before March 22, 2001.

47

Because none of Plaintiffs' claims against Vanguard are before the Court, all counts against Vanguard (Counts I-IV, VII-VIII) remain. Given that Vanguard remains in bankruptcy, the stay regarding Vanguard remains.

Dated: May 19, 2004                    ENTERED

                                       _____
                                       AMY J. ST. EVE
                                       United States District Court Judge